[No. 3782. Decided March 5, 1902.]

WASHOUGAL AND LACAMAS TRANSPORTATION COMPANY, *Respondent,* v. DALLES, PORTLAND AND ASTORIA NAVIGATION COMPANY, *Appellant.*

BOUNDARIES — GRANTS BY GENERAL GOVERNMENT — MEANDER LINES — HIGH WATER MARK — SHORE LANDS — TITLE OF STATE.

Grants made by the federal government of portions of the public lands bordering on or bounded by navigable waters convey the title to ordinary high-water mark, where the meander line and the line of ordinary high-water mark do not correspond, notwithstanding the tract is described in the grant as bounded by the meander line of such waters; consequently the title relinquished to the state by the general government to all tide and shore lands is applicable only to such lands as lie between high and low-water mark, not such as lie between the meander line

and low-water mark.  (*Scurry v. Jones*, 4 Wash. 468, and *Cogswell v. Forrest*, 14 Wash. 1, distinguished.)

SAME — TITLE TO LAND CREATED BY EROSION AND FILLS.

The state cannot assert title to shore lands upon navigable waters within the boundaries of private ownership, when such lands have been formed by the erosion of the banks or fills caused by artificial means.

APPEAL — EQUITY CASES — ABUSE OF COURT'S DECISION IN RE-OPENING CASE FOR EVIDENCE — HARMLESS ERROR.

Although a trial court may have abused its discretion in reopening a case and admitting additional testimony after it had been closed, the supreme court would not, in an equity case which it tries *de novo*, do more than disregard such evidence and would determine the case on what was properly in the record.

Appeal from Superior Court, Clarke County,—Hon. ABRAHAM L. MILLER, Judge. · Reversed.

*Carey & Mays,* for appellant.

*Coovert & Stapleton,* for respondent.

The opinion of the court was delivered by

FULLERTON, J.—This is an action to remove a cloud from title to real property. The respondent, who was plaintiff below, claims title to the property in question by virtue of a deed from the state of Washington, dated October 1, 1898, granting to it "all shore land of the second class situated in front of, adjacent to, or abutting upon that portion of the United States government meander line described according to the certified copy of the surveyor general's field notes as follows:

"Beginning at a point on said meander line on the right bank of the Columbia River in front of Section 17, Township 1 North, Range 4 East, W. M., where the East boundary line of the Richard Ough donation land claim No. 53 intersects same, thence along said meander line in front of Sections 17 and 18, said Township and range, as follows: N. 56 1-4 degrees W., 20.00 chains; to the meander corner

to fractional sections 17 and 18, which meander corner is 19.50 chains South of the corner to sections 7, 8, 17 and 18; thence N. 65 degrees W. 11 chains; thence N. 62 1-4 degrees W. 8 chains to a point on said meander line in front of said Richard Ough donation land claim; being a total length of 39.00 chains as measured along said meander line in front of said sections 17 and 18, Township 1 North, Range 4 East, W. M."

The meander line mentioned is the usual meander line, which is run by the government surveyors along the banks of navigable streams to mark the sinuosities of such streams, and for the purpose of determining the areas of the fractional subdivisions of the public lands bordering thereon. The uplands bordering on this part of the Columbia river were originally conveyed by the United States to Richard Ough and wife as a donation land claim, by patent bearing date December 22, 1865. In 1880, Richard Ough and wife conveyed by warranty deed a part of this claim, a tract containing some seven acres, to Joseph E. C. Durgin and Lewis Love. The description of this tract was by metes and bounds; the south boundary of which was described as running along the right bank of the Columbia river at low-water mark. At the time of the execution of this deed, Ough and wife leased to the grantees named therein the free use of the bank of the river from a point commencing at the southeast corner of the seven-acre tract, and running thence up stream for a distance of two hundred feet. Afterwards one S. G. Reed became the owner, by certain mesne conveyances, of the seven-acre tract, and of the rights granted by the lease, whereupon he purchased from Mrs. Ough, who succeeded to the interests of Richard Ough in the donation land claim, a tract described as beginning at the southeast corner of the seven-acre tract above mentioned, and running from "thence up stream in said river,

and following the low-water line thereof, 200 feet; thence north or back from said river, at right angles with the same, a sufficient distance to include one-half acre of land; thence westerly and parallel with low-water line of said river generally to the east line of said seven-acre tract; thence southerly along said east side line to place of beginning; containing one-half acre, together with riparian rights." Both· of these tracts were afterwards conveyed by Reed to the appellant in this action. The corners of the Ough donation land claim bordering on the Columbia river were long since washed away and obliterated. The evidence shows that measurements made from existing monuments set by the government surveyors at the time of the original surveys would place them in the river below what is now low-water mark. The original meander corner between sections 17 and 18 is also destroyed. This the surveyors employed by the respondent sought to re-establish by measuring from the section corner to sections 7, 8, 17, and 18. This corner was also destroyed, and it became necessary to re-establish it in order to get a base for the measurement. This they did by running a right line between the nearest existing section corners, and setting the last corner at a point proportionate to the distances given in the field notes of the original survey. From the corner thus established they measured south 19.50 chains, and established the meander corner. From the corner thus established they projected the meander line according to the calls in the original field notes given for that line at that point. Between the line thus projected and the present low-water mark of the river is a strip of land varying in width from 50 to 75 feet, extending across the south end of' the half-acre and seven-acre tracts included with the appellant's deed. The respondent claims that this strip of land is

shore land, and is included within its deed from the state of Washington, and that the appellant's deed thereto is a cloud upon its title.   There was a sharp conflict between the testimony of the surveyors testifying on the part of the respondent and those testifying on the part of the appellant as to the true location of the meander line.   The respondent's surveyors located it in the manner we have above indicated.   The appellant's surveyors proceeded by a different method.   They sought to establish the line by re-establishing the corners to the Ough donation land claim, and projecting the meander line according to its courses and distances as given in the field notes between these corners. This survey located the original line below what is now ordinary low-water mark of the river.   They also tested their work by pursuing the methods adopted by the surveyors employed by the respondent.   In so doing they located the section corner to sections 7, 8, 17, and 18 some twenty feet further south than the respondent's surveyors located it.   They also testified that existing monuments set by private surveyors at an early time, when the original surveys were comparatively new and probably easily traced, —such, for example, as the monuments marking the boundaries of the town of Washougal,—would indicate that the section corner had been set originally further south than even their surveys located it, and sufficiently far to place the meander corner below what is now ordinary low-water mark on the river.   There was much uncontradicted evidence also introduced on the part of the appellant tending to show that the river had gradually encroached upon the donation land claim.   It was shown that the corners of the claim, including the witness trees, had been washed away; that a house constructed by the Oughs, which was originally some three hundred feet or more distant from the bank of

the river, is now about fifteen feet distant therefrom; that
an orchard paralleling the river bank had as many as three
rows of its trees washed away. It was also shown that the
banks of the river, particularly in front of the land in dis-
pute, were originally perpendicular,—so much so, in fact,
that there was little or no difference horizontally between
ordinary low and ordinary high water mark; that steam-
boats drawing from $2\frac{1}{2}$ to 3 feet of water, plying on the
river, landed directly against the bank at all seasons of the
year, and discharged and took on freight directly from the
bank. It was further shown that in 1880 some of the ap-
pellant's grantors had constructed a wharf on piles driven
from the bank out to deep water; that this wharf had
tended to collect debris drifting in the river, causing the
bottom of the river to fill at this point, creating shore lands
that did not originally exist.

At the conclusion of the evidence and arguments of
counsel, the court took the case under advisement. , After-
wards the court, on its own motion, made an order reopen-
ing the case for further evidence; reciting therein that the
court was unable to make a finding from the evidence be-
fore it as to the location of the meander line of the Ough
donation land claim at the point in controversy; that the
same was material to a determination of the case; that the
court had theretofore procured two expert and competent
surveyors to make a survey, whereupon he fixed a time for
taking their testimony, and caused notice thereof to be
given to the respective parties. Against this order the ap-
pellant filed a written protest, contending therein that the
court was without power on its own motion to reopen the
case for further evidence, and that it was the court's duty,
if the plaintiff had failed to make a case, to find against it
and dismiss its action. The protest was overruled, and one

of the surveyors named testified at the time fixed for the hearing. His testimony was to the effect that he had run over the lines after the manner adopted by the surveyors testifying for the respondent, testing them by some additional existing monuments, and had found their location of the meander line substantially correct. Thereafter the court made findings to the effect that the meander line as established by the respondent's surveyors was the true meander line; that the land between that line and the present line of ordinary low water was shore land, and passed to the respondent by the deed from the state; that the appellant's deeds were a cloud upon the respondent's title; and entered a decree removing the cloud.

The respondent throughout the trial proceeded upon the theory which the trial court seems to have finally adopted, that all of the lands lying between the meander line of the donation land claim, as originally run by the government surveyors, and the present line of low-water mark on the river, were shore lands, and that such part of it as lay in front of the line described in the deed from the state passed to it in virtue of that deed, regardless of the question whether the land lay below the line of ordinary high-water mark or not. Manifestly this is not the rule. What title or right passes under a grant of lands made by the United States is a federal question, and the judgment of a state supreme court thereon is within the appellate jurisdiction of the federal supreme court. *Shively v. Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548). The judgment of that court on any question affecting the construction of such grants is, therefore, authoritative and binding upon the state courts. That court has repeatedly held that grants by congress of portions of the public lands bordering on or bounded by navigable waters convey the title to ordinary high-water mark,

notwithstanding such navigable waters may have been meandered, and such meander line may not correspond with the line of ordinary high-water mark.

"Meander-lines," says Mr. Justice CLIFFORD, in *Railroad Company v. Schurmeir*, 7 Wall. 272, "are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser."

And in that case it was held,—over the contention that a tract of land granted according to the description contained in the official surveys stopped at the meander line run along the banks of a navigable stream,—that high-water mark on the stream itself, and not the meander line, was the boundary line. To the same effect are the following cases: *Jefferis v. East Omaha Land Co.*, 134 U. S. 178 (10 Sup. Ct. 518); *Hardin v. Jordan*, 140 U. S. 371 (11 Sup. Ct. 808, 838); *Shively v. Bowlby*, 152 U. S. 1 (14 Sup. Ct. 548); *Horne v. Smith*, 159 U. S. 40 (15 Sup. Ct. 988).

But counsel seem to think this court has in its previous decisions announced a different rule. The cases chiefly relied upon to support this claim are *Scurry v. Jones*, 4 Wash. 468 (30 Pac. 726), and *Cogswell v. Forrest*, 14 Wash. 1 (43 Pac. 1098). These cases hold that the state of Washington, by the disclaimer in its constitution (§ 2, art. 17), waived its right to assert title to such of the tide lands as lay *above* the meander line run by the government surveyors as the boundary of uplands which had been conveyed by patent from the government of the United States prior to the admission of the state into the Union. But however illogical it may seemingly be to hold that the meander line marks the boundary of a government grant

when it runs below the line of ordinary high-water mark, but does not so mark it when it runs above that line, it is plain that the distinction rests upon widely differing principles. The title to all tide and shore lands passed to the state at the time of its admission into the Union. From thenceforward the state had the sole and absolute right and power of disposition over such lands, and it could, either in its fundamental law, or by statutory enactment, provide for their disposition. When, therefore, by its constitution, it disclaimed "all title in and claim to all tide, swamp, and overflowed lands patented by the United States," it was within the power of this court to determine the effect of the disclaimer; and the court could very properly hold that its effect was to vest title in the upland owner of all tide lands lying within the meander lines described in the calls of his patent. But the upland boundary of tide and shore lands is the line of ordinary high-water mark. Above that line the state's title does not extend, no matter where the government meander line may have been run; and the state cannot, by deed or otherwise, convey any title to or interest in such land by reason of its ownership of the tide and shore lands bordering thereon. The primary disposition of the soil is vested exclusively in the congress of the United States. And as the federal court of last resort holds that the authorized grants of public lands bordering upon a navigable river made by congress conveys title to the line of ordinary high-water mark of such river, regardless of the meander line, this court must hold the line of ordinary high-water mark to be the boundary of such grants in all instances where the meander line was run above such line.

Applying these principles to the case at bar, it is evident that the meander line, conceding it to be correctly relocated by the trial court, does not necessarily determine

the line of high-water mark of the river, or, what is the same thing, the river boundary of the Ough donation land claim. While the one may be presumptive evidence of the other, it is not conclusive evidence, and can be overcome by proofs to the contrary. Here there are such proofs. It is not only shown that the meander line was originally run, if run at the place the trial court found it to be, above the line of high-water mark, but it is shown, as we have said, by uncontradicted evidence, that originally there were no shore lands at this point; that the line of high and low-water marks were practically coincident, differing only with the rise and fall of the river upon a perpendicular bank; and that such shore lands as may appear at that point now were caused in part by the erosion of the banks, and in part by the debris caught and held by the piling driven in constructing the old wharf erected by the appellant's grantors. This being true, the state had nothing at this place it could pass by a deed purporting to convey shore lands. It cannot be that shore lands created by the erosion of the banks of a stream within the boundaries of a private claim inure to the benefit of the state; nor can the state claim, as shore lands, fills in a river caused by artificial means. If such fills interfered with the right of navigation, it may be that the state could cause their removal as a nuisance, but this would be the extent of its power. It could not take possession of them, or sell them to the private use of another.

As the meander line does not mark the shore line, the question of practice suggested is not material to the determination of the case; and whether it was an abuse of discretion for the court to reopen the case and receive additional evidence, upon its own motion, we shall not determine. It is well to say, however, that this court would not,

in an equity case, even though it should find in this practice an abuse of discretion on the part of the trial court, do more than disregard such evidence. Under the statute, it must try cases of equitable cognizance *de novo,* and this it must do on the evidence properly in the record.

The judgment appealed from is reversed, and the cause remanded with instructions to enter a judgment to the effect that the respondent take nothing by its action; the appellant to recover costs in both courts.

REAVIS, C. J., and DUNBAR, ANDERS AND MOUNT, JJ., concur.