[No. 34302. *En Banc*. September 12, 1958.]

NARROWS REALTY COMPANY, INC., *Respondent,* v. THE STATE OF WASHINGTON *et al., Appellants.*[1]

*The Attorney General, E. P. Donnelly* and *H. T. Hartinger, Assistants,* for appellant.

*Happy, Copeland & King,* for intervener-appellant Girard *et al.*

*Metzger, Blair & Gardner,* for respondent.

FOSTER, J.—The state of Washington, defendant below, and a group of interveners appealed from a judgment quieting respondent's title to a strip of land in Pierce county between the meander line and the line of ordinary high tide.

On March 16, 1883, Charles C. Miller, pursuant to the

[1]Reported in 329 P. (2d) 836.

Timber and Stone act (20 Stat. 89), made proof of all facts necessary for a patent to the three government lots[2] in question bordering on the east shore of the Narrows on Puget sound, an arm of the sea. Miller paid the full purchase price and received, in return, the official receipt of the receiver of the United States land office at Olympia, Washington Territory. The court found:

"That thereupon the said Charles C. Miller became the equitable owner of said lands, the westerly boundary of which was fixed by the meander line as established by United States Government Survey, and entitled to receive a patent for said lands from the United States of America. . . . . ."

The strip here involved is between the line of ordinary high tide[3] and the meander line,[4] which is below that of ordinary high tide, and is illustrated by the sketch below taken from an exhibit.

While Miller then became entitled to a patent, none was issued directly to him or to any successor in interest. However, on July 25, 1892, a patent was issued to John C. Shaw, which patent was decreed, by the United States court, to have been in trust for Miller's successors in interest in whom title was quieted.

Respondent relies upon that patent. The judgment determined that the seaward boundary of the land extended to the meander line as established by the United States government survey. Appellants contend that the patent is

[2] The official receipt covered four lots, but only three are involved in the present suit.

[3] ". . . line of 'ordinary high tide,' that is, the usual or ordinary high-water mark, the limit reached by the 'neap tides,' those tides which happen between the full and change of the moon twice in every 24 hours . . . ." 30 Words & Phrases (Perm. ed.) 253.

[4] "'Meander-lines,' says Mr. Justice Clifford, in *Railroad Company v. Schurmeir*, 7 Wall. 272, 'are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.'" *Washougal & LaCamas Transp. Co. v. Dalles, Portland & Astoria Nav. Co.*, 27 Wash. 490, 68 Pac. 74.

SKETCH ILLUSTRATING LOCATION
OF
GOVERNMENT LOTS 1, 2, 3 AND 4, SEC. 22, TOWN. 21 NORTH, RANGE 2 EAST W.M., TIDE LAND BLOCKS 116, 116 A, 117, 117 A, 118 AND 118 A. TACOMA TIDE LANDS GOVERNMENT MEANDER LINE AND LINE OF ORDINARY HIGH TIDE

erroneous and that the seaward boundary is marked by the line of ordinary. high. tide.

■ Before statehood, the United States held title to all of the land, which is now within the boundaries of the state of Washington, in trust for the future state (*Shively v. Bowlby*, 152 U. S. 1, 38 L. Ed. 331, 14 S. Ct. 548; *Knight v. United States Land Ass'n*, 142 U. S. 161, 35 L. Ed. 974, 12 S. Ct. 258; *Weber v. Board Harbor Com'rs*, 85 U. S. 57, 21 L. Ed. 798; and *Pollard v. Hagan*, 44 U. S. 212, 11 L. Ed. 565), and could have conveyed (prior to statehood) all of such lands, including tidelands. The Timber and Stone act was one of several by which Congress provided for the patenting of such trust lands.

The acts authorizing the disposition of public lands are restricted to uplands and do not include tide or shore lands or lands below the mark of ordinary high tide. *Baer v. Moran Brothers*, 2 Wash. 608, 27 Pac. 470; *Mann v. Tacoma Land Co.*, 153 U. S. 273, 38 L. Ed. 714, 14 S. Ct. 820; *Shively v. Bowlby, supra.*

While Congress possessed the power to dispose of tidelands, it did so only occasionally. *Buttz v. Northern Pac. R. Co.*, 119 U. S. 55, 30 L. Ed. 330, 7 S. Ct. 100; *Railroad Co. v. Baldwin*, 103 U. S. 426, 26 L. Ed. 578. Notwithstanding such occasional patents of tidelands, the ordinary high-tide mark is the true boundary of public lands patented by the United States. *Schmitz v. Klee*, 103 Wash. 9, 173 Pac. 1026; *Johnson v. Brown*, 33 Wash. 588, 74 Pac. 677.

■ Upon admission to the Union, the ownership of tidelands vested in the state of Washington except for those already patented, and, under Art. XVII, § 1, of the Washington constitution, the state asserted ownership in all tidelands.[5]

But, because some tidelands had already been patented

[5]"The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: ' *Provided*, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state."

by the United States, the state, in the constitution, waived its claim to such previously patented tidelands by Art. XVII, § 2, which is as follows:

"The state of Washington disclaims all title in and claim to all tide, swamp and overflowed lands, patented by the United States: *Provided,* the same is not impeached for fraud."

*Scurry v. Jones,* 4 Wash. 468, 30 Pac. 726, held the disclaimer clause to be a present grant of the state's interest in tidelands previously patented. The court's language is:

" . . . For, while it is true that the language used is not in form confirmatory, yet, when we take into consideration the situation of affairs, and the object to be accomplished by such disclaimer, we do not see how this object can be given force without construing the language used as substantially a grant to the patentees of the interest of the state in the land so situated. Under the law, as conceded by both parties, the lands had passed absolutely to the state, subject only to such clouds thereon as were caused by the same having been assumed to have been granted to private individuals by the United States. Under such circumstances, if the state disclaims all of its title to such lands, where the patents had been obtained without fraud, it certainly was for the benefit of some one, and it clearly could not have been for the benefit of the United States. And as the state, in the section immediately preceding this, had asserted its title to all such lands, whether occupied or unoccupied, which had not been thus patented, it seems clear to us that the evident intent of the disclaimer was to ratify the action of the United States in the issuance of such patents. In our opinion, the interest of the state passed as fully to the grantees in such patents, or to those holding under them, as it would have done had there been express words of grant used in the constitution. Any other interpretation of the language used would deprive it of any beneficial force whatever."

This case is especially significant because the writer of the court's opinion, Judge Hoyt, was president of the Constitutional convention which adopted the constitution only three years previously.

█ Appellants argue that the constitutional disclaimer clause does not apply here because the patent was not is-

sued until after statehood, but *Wilson v. Prickett,* 79 Wash. 89, 139 Pac. 754, and *Kneeland v. Korter,* 40 Wash. 359, 82 Pac. 608, hold that the clause applies even though the patents were not issued prior to statehood. We said in the *Kneeland* case:

"To the contention that this section of the constitution applies only to lands patented at the time of its adoption, it may be answered that such a construction would sacrifice the spirit of the section. Can it be supposed that the constitution makers intended to discriminate between two persons who had, in good faith and for value, become entitled to all of the government's property rights in certain portions of such lands—one of whom had already received his evidence thereof (the patent), and the other of whom had not, although equally entitled thereto? It seems to us that this would be to give consideration to form rather than substance, and to make a distinction justified neither in law or right. . . .

"As the railroad company had been entitled to its patent long before the adoption of the state constitution, we think it was as much entitled to the benefit of the disclaimer of § 2 as if it had already received its patent at the time. We can see no reason for discrimination, and cannot hold that the people intended any."

In both instances, the court was dealing only with congressional railroad land grants. It is said that, because *Kneeland v. Korter, supra,* directly holds that railroad land grants conveyed a present interest by the United States to the tidelands, nothing remained upon which the disclaimer clause could operate and that the statements in the opinion that the disclaimer clause is a present grant from the state is dictum. In other words, if the railroad grants were present conveyances of the tidelands by the United States before statehood, the state thereafter had nothing to grant. Assuming for present purposes that this language is dictum in the *Wilson* and *Kneeland* cases, the reasoning is compelling, and we believe that these cases state the correct rule as applied to the facts of the instant case.

The trial court was correct in quieting respondent's title

to the strip in question, and the judgment is, therefore, affirmed.

HILL, C. J., DONWORTH, FINLEY, WEAVER, OTT, and HUNTER, JJ., concur.

November 10, 1958. Petition for rehearing denied.