[No. 37583. En Banc. January 20, 1966.]

STELLA HUGHES, *Respondent,* v. THE STATE OF WASHINGTON, *Appellant.*\*

\*Reported in 410 P.2d 20.

*The Attorney General, Harold T. Hartinger* and *Laurel L. Tiller, Assistants,* for appellant.

*Charles B. Welsh,* for respondent.

WEAVER, J.—The questions of law generated by this appeal spring from article 17 of the state constitution, its historical background, and its interpretation, legislative, administrative, and judicial.

## Article XVII—TIDE LANDS

§ 1 DECLARATION OF STATE OWNERSHIP. The state of Washington *asserts its ownership* to the beds and shores of all navigable waters in the state *up to and including the line of ordinary high tide, in waters where the tide ebbs and flows,* and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: *Provided,* that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state.

§ 2 DISCLAIMER OF CERTAIN LANDS. The state of Washington disclaims all title in and claim to all tide, swamp and overflowed lands, patented by the United States: *Provided,* the same is not impeached for fraud. (Italics ours.)

Plaintiffs, Stella Hughes, is the owner of an upland tract of land on the Long Beach Peninsula near Ocean Park,

Pacific County, Washington. Title is deraigned from a patent issued prior to statehood. In this action to quiet title plaintiff alleges[1] that the west boundary of the tract is described as

the line of *ordinary high tide* of the Pacific Ocean. (Italics ours.)

She prays that the court establish the westerly boundary of her property to be "the line of *mean high tide* of the Pacific Ocean." No time for the determination is indicated.

The trial court found that since the original survey and establishment of the meander line by the United States government in 1859, imperceptible accretions have formed in front of plaintiff's property, both before and after November 11, 1889, and that all the accretion belongs to plaintiff as upland owner. The state does not claim the accretion prior to 1889, the date of its admission to the union. It contends, however, that the present western boundary of plaintiff's land and the present eastern boundary of the state's tidelands is the line of "ordinary high tide" as it existed November 11, 1889. In its answer and cross complaint, the state alleges that this line on November 11, 1889 was described as follows:

Beginning at a point whose Y coordinate is 436,139.17 and whose X coordinate is 1,104,683.64, referred to the Washington Coordinate System, South Zone, and running thence on an azimuth of 1°14'05" 3412.79 feet to a point whose Y coordinate is 432,727.18 and whose X coordinate is 1,104,610.10, referred to said coordinate system.

The state appeals from a judgment dated February 10, 1964, which determines:

that the western boundary of the foregoing property [of plaintiff] is the line of *mean high tide* of the Pacific Ocean

---

[1]Plaintiff alleges ownership of the following described property:

"Beginning at a point 1353 feet north from the line between Sections 4 and 9, Township 11 N. R. 11 West W. M. and 437.3 feet west from the west line of State Highway No. 12-A, thence north 226.6 feet, thence west 300 feet more or less to the line of *ordinary high tide* of the Pacific Ocean, thence South 226.6 feet, thence East 300 feet more or less to beginning." (Italics ours.)

*as it now or hereafter may exist,* which line is the average elevation of all high tides as observed at a location in front of the property through a complete tidal cycle of 18.6 years. (Italics ours.)

We point to the possible difference between "ordinary high tide," as set forth in the constitution, and "mean high tide as it now (February 10, 1964) or hereafter may exist," as determined by the trial court. We also point out that the superior court determined a possible changing or shifting western boundary for plaintiff's property.

This appeal brings into sharp focus the following questions:

(a) When did title to the tidelands vest in the State of Washington? (b) What is the *nature* of the State's ownership? (c) What is the *extent* of the State's ownership? *i.e.* what is the dividing line between the upland property and the state-owned tideland? (We are not concerned with the seaward line in the instant case. See the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301-1315 (1958 ed.)). (d) Is the dividing line a fixed line or is it a changing line depending upon accretion or reliction? (e) If a fixed line, as of what date should it be established? The trial court said in its oral opinion:

It is a rather interesting circumstance to me that this being 1964, it is about 75 years since statehood and that our State Supreme Court would not have been called upon specifically and directly to decide the questions involved here and particularly that question of moving line."

Undoubtedly there are other questions that might arise, but we deem the foregoing sufficient to present the issues of the instant case.

For the sake of clarity and in order to illustrate the facts we set forth the following sketch, prepared by the court from exhibits in the record. It is not drawn to scale.

*History of Constitutional Provision*

The questions presented by the instant case are not new. As early as 1854 the territorial legislature granted owners of property abutting navigable waters the right to build wharves, under certain conditions, and to "extend them so far into said waters or water courses as the convenience of shipping may require," and to maintain them for not more than 20 years.[2]

On numerous occasions the territorial legislature memorialized Congress to grant tidelands to the territory so that they might be sold and the funds used for internal improvements,[3] or to grant them to certain towns and cities to aid in their development.[4] In 1873 the territorial legis-

[2]Laws of Washington Territory 1854, p. 357.

[3]Laws of Washington Territory 1869, p. 527.

[4]Laws of Washington Territory 1859, p. 500 (Olympia).
Laws of Washington Territory 1871, p. 220 (Olympia).
Laws of Washington Territory 1871, p. 213 (Seattle).

lature passed an act confirming the title of the Seattle and Walla Walla Railroad and Transportation Company to the tidelands south of King Street in Seattle and around Elliott Bay "from extreme high to extreme low tide, and to deep water . . . derived by deed from the city of Seattle to the said company dated August 19, 1873," provided the first section of 15 miles of railroad be constructed within three years. The territory purported to convey such title "as would otherwise belong to and vest in the state, upon the admission of Washington Territory into the Federal Union as a state."[5]

One cannot read the record of the proceedings of the state constitutional convention[6] and the newspaper and editorial comment published during the convention (*Yelle v. Bishop,* 55 Wn.2d 286, 292, 347 P.2d 1081 (1959)), between July 4 and August 22, 1889, without concluding, as do the historians of that period,[7] that the most vexing and politically sensitive problem confronting the convention was that of harbors, and the control, use, ownership, and disposal of the tidelands of the new state to be. No other problem was of more vital concern to the economic development of the state, for the tidelands in front of Seattle and other cities on Puget Sound and the ocean were of tremendous value.

During the convention suggested constitutional proposals ranged from a declaration of inalienable state ownership of tidelands with limited leasing privileges, to no declaration at all, thus leaving all questions of tideland ownership and use to the whim of future legislatures. The major source of difference arose from whether the state, the cities, or private individuals and corporations should control the water front. Generally, five groups brought pressure to bear upon the 75 members of the convention: (1) the own-

[5]Laws of Washington Territory 1873, p. 577.

[6]The Journal of the Washington State Constitutional Convention, 1889, p. 809 *et seq.* (Book Publishing Co. 1962).

[7]See Nesbit, "He Built Seattle" p. 308 *et seq.* (University of Washington Press, 1961). This is a biography of Thomas Burke, Chief Justice of the Territorial Supreme Court, 1888–1889.

ers of upland property; (2) the occupiers or preemptors of tidelands who had placed improvements thereon; (3) land speculators; (4) cities and towns; and (5) the railroads. The conflict of interests was sharp and the debates reported were acrimonious.

It was not until August 22, 1889, the final day of the convention, that article 17 (quoted *supra*) was adopted.[8] The article is, in truth, a Janus-like compromise of the contentions of the various schools of thought in the constitutional convention. Although it asserts state ownership of tidelands and disclaims all right to tidelands theretofore patented by the United States, it makes no declaration of policy to govern the use or disposition of such lands. The convention left the use and sale of state-owned tidelands to the politics of future legislatures and to the interpretation to be given article 17 by the Supreme Court.

Before discussing our decisional law, it is necessary to review briefly the tideland statutes subsequent to statehood, the definition of "the line of ordinary high tide," and the administrative and superior court interpretations of the statutes.

*Tideland Statutes Subsequent to Statehood in 1889*

Since article 17 was a compromise of the various interests represented in the constitutional convention, it is not surprising to find tideland politics carried forward into subsequent legislative sessions.

The early statutes provide for the survey, classification, and appraisal of state-owned tidelands[9] and set forth the method and manner of sale or lease thereof. Oyster beds were "withdrawn and reserved from sale or lease for the purpose of establishing a natural oyster bed reserve."[10] A railroad was granted the right to maintain tracks and

---

[8] Austin Mires (a member of the constitutional convention), "Remarks on the Constitution of the State of Washington," The Washington Historical Quarterly, Vol. 22, No. 4, Oct. 1931, p. 276.

[9] Laws of 1889-90, p. 431, 731; Laws of 1891, p. 403; Laws of 1893, ch. 17, p. 26; ch. 49, p. 241.

[10] Laws of 1891, p. 366.

wharves on tidelands.[11] Although abutting property owners were given a preferential right to purchase tidelands, one having placed improvements thereon prior to March 26, 1890 had the exclusive right to purchase if used for "commerce, trade, residence, or business."[12] Laws of 1899, ch. 83, § 1, p. 132[13] was the first legislative recognition of accretion to tidelands. The statute provided:

That any accretions that may be added to any tract or tracts of tide or shore lands *heretofore sold or that may hereafter be sold by the state shall belong to the state,* . . . . (Italics ours.)

■ The statute treats with accretion to *tidelands* "heretofore sold or that may hereafter be sold" by the state. The accretion belongs to the state. The statute does not purport to determine ownership of accretion when the tidelands have not been sold. See *Strand v. State,* 16 Wn.2d 107, 129, 132 P.2d 1011 (1943). We do not construe the statute in any sense to be a waiver by the state of its interest in tidelands. It is more logical to conclude that this is a legislative recognition of the state's claim to all accretion after 1889 whether the tidelands be sold or not. The statute is at least indicative of the legislative intent to claim accretion for the state under the limited circumstances identified.

It was not until Laws of 1901, ch. 105, p. 217, and ch. 110, p. 225, that the *public's* interest in tide and shoreland received legislative recognition. Sections 1 and 2, chapter 110 (RCW 79.16.170, 171) provide:

That the shore and beach of the Pacific Ocean, including the area or space lying, abutting or fronting on said ocean *and between ordinary high tide and extreme low tide (as such shore and beach now are or hereafter may be)* from the Columbia river or Cape Disappointment on the south to a point three hundred feet southerly from

[11]Laws of 1897, ch. 88, p. 228.

[12]Laws of 1897, ch. 89, § 45, p. 250.

[13]*Laws of 1899, ch. 83,* § 1, amending Laws of 1897, ch. 89, § 51; reenacted by Laws of 1927, ch. 255, § 123; now codified as RCW 79.01.492. The reenactment made a few minor changes in the 1899 wording. See *Ghione v. State,* 26 Wn.2d 635, 650, 175 P.2d 955 (1946) for the changes.

the south line of the government jetty on Peterson's Point, State of Washington on the north, be and the same *are hereby declared a public highway forever,* and as such highway shall remain forever open to the use of the public. (Italics ours.)

No part of said shore or beach shall ever be sold, conveyed, leased or otherwise disposed of.

The statute declares certain shore and tidelands a "public highway forever."[14] It does not purport to reserve *all* state-owned tideland in the vicinity as a public highway. We point out that the public highway is not described as abutting upland property; it is defined as "abutting or fronting on said ocean." Its seaward boundary is "extreme low tide"; its inland boundary is the line of "ordinary high tide . . . as such shore and beach now are [1901] or hereafter may be." Assuming that there had been accretion between 1889 and 1901, it does not follow that this statute disclaims state ownership therein. State-owned land may still remain between the inland boundary of the "public highway" (ordinary high tide as such shore and beach now are) and the 1889 line of ordinary high tide. It might, of course, be subject to sale to the abutting upland owner or others as the statutes provide. True, the boundaries of the reserved public highway may shift seaward because of accretion (a question we do not decide), but such move would in nowise affect the inland boundary of state-owned lands. It would simply preserve the prime portion of the beach for the public.

Our interpretation of Laws of 1901 (RCW 79.16.170 quoted *supra*) is fortified by Laws of 1929, ch. 78, which provides:

---

[14]The highway created is not a road intended for automobile traffic. It is a recreational area. As Judge Fullerton explained in *Williams Fishing Co. v. Savidge,* 152 Wash. 165, 181, 277 Pac. 459, 464 (1929):

" . . . Prior to the year 1901, when the legislature declared the tide lands to be a public highway, the beach had become a favored resort for the people of the state who were seeking rest and recreation, and, as I gather from the surroundings and the current history of the times, the purpose of the legislature was, not so much to establish a thoroughfare, as it was to preserve the beach as a recreational ground for the use of the public. . . ."

The commissioner of public lands is hereby authorized to offer for sale and sell in the manner hereinafter provided, all, or any portion of, the following described lands:

[described]

*lying above and on the land side of the inner boundary of the highway reservations made by chapter CV [105] and chapter CX [110], Laws of 1901,* same being a line of ordinary high tide as the same is now located or as it may hereafter exist. (Italics ours.)

Thus, the legislature recognized an "inner boundary of the highway reservation" and authorized the sale of lands lying inland of this inner boundary of the highway reservation.[15]

A fundamental error of the trial court in the instant case is the application of the 1901 and 1929 statutory language to "a line of ordinary high tide *as the same now is or as it may hereafter exist*" (italics ours) to a factual situation to which it has no application.

## The Nature of Tides

Tides are the result of gravitational attraction of the moon and sun upon the waters of the earth. Their heights vary with the changing positions of the moon, sun and earth in relation to each other. Changes in winds, barometric pressures, and the freshets or droughts of rivers, together with the geography of the locale, will cause tides to be higher or lower than predicted by the United States Coast and Geodetic Survey. There are usually two high and two low waters or tides a day. They may be designated, lower low water, low water, high water and higher high water. The datum (plane of reference) from which the heights of

---

[15]Laws of 1963, ch. 212, p. 1058 provides that that portion of the public highway established by Laws of 1901, chapters 105 and 110 "lying between the line of vegetation and the line of mean high tide, as such lines now are or may hereafter be, is hereby declared *a public recreation area* and is hereby set aside and forever reserved for the use of the public." (Italics ours.) We believe this is the first legislative use of the terms "line of vegetation" and "mean high tide" as distinguished from "ordinary high tide."

tides are calculated on the Pacific Coast (with the exception of Balboa, Panama) is the mean or average of the lower of the two low waters of each day.[16]

In Marmer, *Tidal Datum Planes,* p. 86 (U.S. Dep't of Commerce, Coast and Geodetic Survey, Special Pub. No. 135, rev. ed. 1951), it is stated:

> In view of the variations to which the height of high water is subject, mean high water [tide] at any place may be defined simply as the average height of the high waters at that place over a period of 19 years.

In its findings of fact, the trial court stated:

> mean high tide of the Pacific Ocean is defined as the average elevation of all high tides as observed at a location through a complete tidal cycle of 18.6 years, and the actual western boundary line of plaintiff's property is where that elevation meets the shore *as it exists at any particular time.* (Italics ours.)

Since the line of "mean high tide" is an average over a period of years of the two daily high tides, one being higher than the other, it is apparent that the higher high tide will wash inland from the line of "mean high tide." This is illustrated by an exhibit showing the observed high tide on January 23, 1963 at a point a few feet south of plaintiff's property to have been 130 feet inland from the line of predicted "mean high tide." The difference in elevation was 3 feet. In the instant case, in front of plaintiff's property the distance between the line of *"ordinary* high tide" in 1889, as defined by the state, and *"mean* high tide," as *presently* determined by the United States Coast and Geodetic Survey and adopted by the trial court, is 561 feet; the difference in elevation is 14.25 feet.

The problem presented is pinpointed by one author as follows:

---

[16]Bowditch, American Practical Navigator, p. 252, U.S. Navy Dept. Hydrographic Office, No. 9 (1943); 1965 Tide Tables, p. 7, U.S. Dept. of Commerce, Coast and Geodetic Survey; See *United States v. California,* 381 U.S. 139, 14 L.Ed. 2d 296, 85 Sup. Ct. 1401 (May 17, 1965), in which the court equated the "line of ordinary low water" with "mean lower low water." Shalowitz, 2 Shore and Sea Boundaries 255 (U. S. Dept. of Commerce 1964).

Boundaries determined by the course of the tides involve two engineering aspects: a vertical one, predicated on the height reached by the tide during its vertical rise and fall, and constituting a tidal plane or datum, such as mean high water, mean low water, etc.; and a horizontal one, related to the line where the tidal plane intersects the shore to form the tidal boundary desired, for example, mean high-water mark, mean low-water mark. . . . The first is derived from tidal observations alone, and, once derived (on the basis of long-term observations), *is for all practical purposes a permanent one.* Shalowitz, 1 Shore and Sea Boundaries 89 (United States Department of Commerce 1962). (Italics ours.)

"Mean high tide" is measurable and determinable.

█ On the other hand, "the line of ordinary high tide" as used in article 17 of the constitution is not a term of technical exactness. It is indefinite at best and an oversimplification of a phenomenon inherently complex and variable. In the absence of any indication to the contrary, we deem the word "ordinary" to be used in its everyday context. The "line of ordinary high tide" is not to be fixed by singular, uncommon, or exceptionally high tides, but by the regular, normal, customary, average, and usual high tides. One cannot sit and watch the tide reach its stand at different elevations on each turn as it ebbs and floods without realizing that a line to be fixed by it must be based upon an average. Thus the line of "ordinary high tide" is the average of all high tides during the tidal cycle.

*Administrative and Superior Court Interpretations*

The record before us supports the conclusion that the commissioner of public lands has established the common boundary between upland property and state-owned land to be the line of ordinary high tide where it existed November 11, 1889. Over the years, 73 lawsuits affecting 322 private ownerships have been instituted against the state to establish this boundary. The judgments of the superior court are before us as exhibits in the instant case. None was appealed. The state accurately described these judgments when it said in its opening brief:

In every one of these cases the court has divided the accreted lands on the same formula: those accreted lands formed prior to statehood are the property of the private upland owner; those accreted lands formed since statehood are public beach and shore.

The language of these judgments varies in minor respects. In some the 1889 line of ordinary high tide is related to a surveyed corner and described by metes and bounds; in others it is described as being a stated number of feet above the "line of mean lower low water," thus a standard set by the United States Coast and Geodetic Survey is recognized; in still others, the 1889 line is described with particularity by reference to the Washington Coordinate System, South Zone, as claimed by the state in the instant case. In practically all of the judgments the 1889 line as surveyed and described therein is judicially determined to be the line of "ordinary high tide where it existed on the 11th day of November, 1889, established by the commissioner of public lands." Thus over the years the only state constitutional court of general jurisdiction established a rule of property which has been relied upon and applied on many occasions when the state has sold tidelands pursuant to statutory authority.

Following the decision of this court in *Harkins v. Del Pozzi,* 50 Wn.2d 237, 310 P.2d 532 (1957), the superior court judgments entered thereafter further described the 1889 line as the "line which the water impressed on the soil by covering it for sufficient periods to deprive the soil of vegetation." This added nothing to the line which had already been surveyed and established. In *Shelton Logging Co. v. Gosser,* 26 Wash. 126, 66 Pac. 151 (1901), this court had already considered the line of vegetation and the line of mean high tide to be the same. Further, in *Harkins, supra,* there was an unchallenged finding of fact equating "the line of ordinary high water" with the "line of mean high tide." No further description was necessary.

### Court Decisions

Two years after its adoption, the landmark case of *Eisenbach v. Hatfield,* 2 Wash. 236, 26 Pac. 539 (1891), brought

article 17 of the constitution to the Supreme Court for construction and interpretation. The five-man court[17] was unusually well qualified to consider it.[18]

Plaintiff, the owner of upland property abutting the high-water mark of Puget Sound, claiming he was entitled to certain littoral rights, sought to enjoin defendants from maintaining and using certain improvements upon tidelands in front of the property. The improvements had been erected prior to March 26, 1890, were in actual use for commerce, trade and business, and subject to purchase by defendants under Laws of 1889-90, § 11, p. 435. (See *supra.*)

■ At the outset, we emphasize, as does the *Eisenbach* opinion, that "riparian rights in the several states are settled by the respective states for themselves." The decision was made when the constitution was adopted in 1889 and confirmed by the admission of the state into the federal union upon an equal basis with other states.

> The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows. . . . Const. art. 17, § 1.

The constitutional assertion of state ownership is clear and unambiguous. As Judge Anders said in his well-considered opinion, "it is scarcely necessary to look beyond our own constitution and laws for authority to guide us to a conclusion."

In the *Eisenbach* case, plaintiff contended that whatever may be the title of the state to the soil under tide water, he, by virtue of his contiguity to the water, had certain rights in the shore peculiar to himself. He claimed a vested property right (a) to wharf out opposite his upland and have unobstructed access to the navigable water in front

---

[17]See Chronological History of the Supreme Court of the State of Washington, 61 Wn.2d 792 (1963).

[18]Judge John P. Hoyt had been president of the constitutional convention; Judge Ralph O. Dunbar had been chairman of the committee to draft the constitutional provisions for state, school, and granted lands, which encompassed tidelands; and Judge T. L. Stiles, who wrote the dissent, actively opposed constitutional regulation of tidelands on the ground the doctrine was against sound public policy.

of his property and (b) to acquire by accretion land that might thereafter be formed.

After a meticulous analysis of the authorities, this court said:

> The foregoing decisions of the highest judicial tribunal of the United States, without other or further authority, would seem to settle, beyond controversy, the question of title to the tide lands of this state, and to leave no doubt whatever that they belong to the state in *actual propriety,* and that the state has full power to dispose of the same, subject to no restrictions save those imposed upon the legislature by the constitution of the state and the constitution of the United States; and, if this be true, it necessarily follows that no individual *can have any legal right* whatever to claim any easement in, or to impose any servitude upon, the tide waters within the limits of the state, without the consent of the legislature. (Italics ours.)

The court concluded:

> We think the authorities abundantly show that a riparian proprietor on the shore of the sea, or its arms, has no rights as against the state or its grantees to extend wharves in front of his land below high water mark.

The court did not completely resolve plaintiff's second contention in the *Eisenbach* case—his claimed vested right to future accretion. The court said:

> we are unable to see how one can have a *present* vested right to that which does not exist, and which may never have an existence. (Italics ours.)

The court did, however, point out that the authorities to the contrary were "based either upon statutes or local customs, and are therefore not precedents binding upon us."

■■ That which did not exist when *Eisenbach* was decided—accretion seaward of upland property—now exists. We conclude that its ownership is resolved by the *rationale* of *Eisenbach* and that accretion formed since November 11, 1889 is an addition to state-owned property, not to upland property. As the court said:

> The result of our investigation of the authorities leads us to the conclusion that riparian proprietors on the

shore of the navigable waters of the state have no special or peculiar rights therein as an incident to their estate. To hold otherwise would be to deny the power of the state to deal with its own property as it may deem best for the public good.

Our conclusion is not startling. It is simply a reaffirmance of a rule of property established by many prior superior court decisions heretofore discussed, and of the rule relied upon over the years in a myriad of land transactions between individuals and between the state and individuals.

At the next session of the Supreme Court the questions discussed in *Eisenbach* were again submitted to and reexamined by the court in *Harbor Line Comm'rs v. State ex rel. Yesler,* 2 Wash. 530, 27 Pac. 550 (1891). The court said:

The court is still of the opinion that, as against the state, a littoral owner, simply as such owner, can assert no valuable rights below the line of ordinary high tide.

The somewhat careful examination which I have given this case has confirmed my opinion that at common law the sovereign power (resting in England in parliament) could take such lands without compensation, and absolutely exclude the littoral proprietors from any rights thereto.

The state's constitutional assertion of ownership in 1889 terminated any rights the upland owner may have had to future accretion. Thereafter, the possible rights of an upland owner are those that might be established by the legislature.

This conclusion is fortified by the court's opinion in *Washougal & LaCamas Transp. Co. v. Dalles P. & A. Nav. Co.,* 27 Wash. 490, 68 Pac. 74 (1902), wherein the state's grantee of shorelands sought to claim shorelands created in part by erosion (the opposite of accretion) and by debris caught and held by pilings. The court held:

It cannot be that shore lands created by the erosion of the banks of a stream within the boundaries of a private claim inure to the benefit of the state; nor can the state claim, as shore lands, fills in a river caused by artificial means.

In the instant case plaintiff's (respondent's) argument in support of the judgment of the trial court orbits around three decisions: *Borax Consol. Ltd. v. Los Angeles*, 296 U.S. 10, 80 L.Ed. 9, 56 Sup. Ct. 23 (1935), *Ghione v. State*, 26 Wn.2d 635, 175 P.2d 955 (1946), and *United States v. Washington*, 294 F.2d 830 (9th Cir. 1961). It was apparently the third decision which triggered this action.

We do not find the three cases apposite. *Borax, supra,* establishes the rule that mean high tide (the average height of all high waters through a complete tidal cycle) is the criterion for "ordinary high water."[19] The case does not involve the question of accretion.

Some of the language in *Ghione, supra,* read without reference to the particular facts before the court, seems to lend weight to respondent's argument in support of the judgment. This case, however, involves the ownership of the bed of two rivers, first surveyed in 1865. River courses had changed gradually over the years; one was changed artificially in 1913. Finally one river ceased to flow when the level of the water of Lake Washington was lowered in 1915. The case does not involve tidelands. We have no quarrel with the decision as applied to the facts; we do not, however, deem it controlling of the instant case.

In *United States v. Washington*, 294 F.2d 830 (1961), certain lots in Grays Harbor abutting on the Pacific Ocean belonged to the federal government subject to a trust patent issued in 1916 to Samson Johns, a Quinault Indian. The lots were at all times part of the public domain until patented. The court applied federal law and determined that accretion belonged to the uplands owned by it subject to the trust patent. We do not question the federal government's right over its own property, but the rules applied by the United States Court of Appeals do not override the established rules of property of the sovereign state in a controversy between it and one of its citizens.

---

[19]We are aware of the footnote reference in *Narrows Realty Co. v. State*, 52 Wn.2d 843, 329 P.2d 836 (1958), equating "the line of ordinary high tide" with "neap tides," but the reference is not necessary to the decision and is, therefore, dictum.

In conclusion, we hold that the state acquired ownership of tidelands in actual propriety November 11, 1889. The property line is the line of ordinary high tide, which we equate to mean high tide on that date. Littoral rights of upland owners were terminated. Upland owners have only those rights subsequently recognized by legislative enactment. All accretion subsequent to November 11, 1889 is owned by the state and may be sold or reserved as a public highway or public recreation area as the legislature shall determine.

The judgment is reversed and the cause remanded for entry of judgment not inconsistent with the views herein expressed.

It is so ordered.

ROSELLINI, C. J., DONWORTH, FINLEY, OTT, HAMILTON, and HALE, JJ., concur.

HILL, J. (dissenting)—I find myself lost in admiration at the scholarship and erudition manifested in the majority opinion. However, all the legal signposts that I can read *and understand* point in the opposite direction, so I am compelled to dissent.

We must decide whether the westerly (seaward) boundary of Stella Hughes' property is the present mean high tide line, or whether it is the line of ordinary high tide as the state of Washington computes it to have been on November 11, 1889. It is really as simple as that.

Signpost 1: Location of plaintiff's westerly (seaward) boundary is a federal question.

The plaintiff traces her title to a federal patent issued before Washington became a state. This court recognized a long time ago the right of federal courts to ascertain the limit of federal grants. See *Washougal & LaCamas Transp. Co. v. Dalles, P. & A. Nav. Co.*, 27 Wash. 490, 496, 68 Pac. 74 (1902). In *Borax Consol., Ltd. v. Los Angeles*, 296 U.S. 10, 80 L.Ed. 9, 56 Sup. Ct. 23 (1935), it was stated that when a federal patent is involved, the boundary between upland and tideland is necessarily a federal question. True, no accretions were involved, but it seems unlikely that this

would have made any difference as to whether federal law should be applied.

Signpost 2: Federal law being applicable, the "shifting boundary theory" applies.

If federal law is applicable, then *United States v. Washington*,[20] 294 F.2d 280 (9th Cir. 1961), *cert. denied*, 369 U.S. 817 (1962), is decisive. That case holds that imperceptible accretions go with the uplands whenever title to the uplands is derived from the United States. The western or seaward boundary to the property involved[21] in that case was, as here, the line between uplands and tidelands. The present line of "mean high tide," which was defined as the average elevation of all high tides at a given location through a complete tidal cycle of 18.6 years, was held to be that boundary. This definition was formulated by the United States Coast and Geodetic Survey and is part of what has been called the "shifting boundary theory." 2 Shalowitz, Shore and Sea Boundaries, 503 note 34.

This is the western or seaward line fixed by the trial court in this case, and it should be affirmed.

If this seems a ridiculously short and simple solution of the apparently complex problem with which the majority opinion deals, I can only say that it is the result dictated by common law,[22] and (as we have seen) by the federal

---

[20] It is interesting to note that in the cited case the state of Washington made all of the arguments it makes here for its fixed boundary of November 11, 1889, but found the Circuit Court of Appeals a forum less friendly to its idea of rewriting the law relative to accretions.

[21] The property involved: "Lots 3 and 4 of section 15 in township 18 north of range 12 west of the Willamette Meridian, adjacent to the Pacific Ocean in Grays Harbor County, Washington," belonged to the United States, subject to a trust patent issued in 1916 to Samson Johns, a Quinault Indian who died in 1930. In 1858, these lands were surveyed by the General Land Office, which established a meander line along and adjacent to the Pacific Ocean. The accretions which pushed the high-water mark seaward were held to belong to the United States subject to the heirs of Samson Johns, and not to the state of Washington.

[22] ". . . At common law the person whose land is bounded by sea, lake or river owns any additions thereto resulting from imperceptible accretion." *United States v. Washington, supra* (p. 834); *Shively v. Bowlby*, 152 U.S. 1, at page 35, 38 L.Ed. 331, 14 Sup. Ct. 548 (1894).

law. It is a plain and well-traveled legal path. To arrive at the result the state desires (and the majority approves), a new, circuitous and rather devious route, rarely explored, must be followed. This is conceded in the state's brief when it says:

> It is a rare occurrence, of course, when a state denies a riparian owner title to tidelands[23] that have become fast lands by slow and imperceptible accretion, but at least two other states have done so.

I would extend my discussion to point out four interesting circumstances that have been lost sight of, or at least have been obscured, to date:

1. We have not previously defined the exact meaning of the phrase "line of ordinary high tide," as used in art. 17, § 1 of our state constitution.

The case of *Harkins v. Del Pozzi*, 50 Wn.2d 237, 240, 310 P.2d 532 (1957) states:

> The line of ordinary high tide is that line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of vegetation and destroy its value for agricultural purposes.

However, the authority cited for this proposition is an Idaho case which was actually concerned with the ordinary high water mark on Lake Pend Oreille. The Circuit Court of Appeals rejected such a definition in *United States v. Washington, supra,* saying:

> In the case of tidal waters such as are involved here, the high-water mark means the line of high water as determined by the course of the tides, not as determined by physical markings made upon the ground by the water. The latter method of making this determination, which was followed by the district court, is appropriate only in the case of streams and other non-tidal waters which have no absolute ascertainable level because of variations of flow from a multitude of causes. (p. 834)

There is also dictum in *Narrows Realty Co. Inc. v. State,* 52 Wn.2d 843, 844 n.3, 329 P.2d 836 (1958), which defines the phrase as:

---

[23]I would interpolate "former" before "tidelands."

" . . . line of 'ordinary high tide,' that is, the usual or ordinary high-water mark, the limit reached by the 'neap tides,' those tides which happen between the full and change of the moon twice in every 24 hours . . ." 30 Words & Phrases (Perm. ed.) 253.

Neither of these cases involved imperceptible accretions or were concerned with the problem of possible shifting boundaries.

The question of whether the "line of ordinary high tide" is a shifting line is squarely presented here, and I believe the definition of this constitutional phrase should (and perhaps must) be identical with the definition of "mean high tide" heretofore quoted and adopted by the federal courts.

2. The state's ownership of

the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows . . . . Const. art. 17, § 1.

is not questioned. Any rights of riparian or littoral owners in such "beds and shores" have properly been held to present a question of local law. Such a case was *Eisenbach v. Hatfield*, 2 Wash. 236, 26 Pac. 539 (1891), on which the state and the majority place great reliance. The case dealt solely with the relative rights of the state and the upland owner in the tidelands, the court holding that the upland owner had no right to extend a wharf beyond the high-water mark. The court specifically declined to decide whether plaintiff would be entitled to future accretions to his land.

No question, as to the complete control of the state over "beds and shores" of all navigable waters is raised. Hence, the *Eisenbach* case has, it seems to me, no application.

The state had, on November 11, 1889, and the state has today and has had at all intervening times, title to the beds and shores of all navigable waters of the state lying seaward of the line of ordinary high tide (properly equated to mean "the line of mean high tide," as defined herein). The state loses no tidelands by the shifting boundary, because

the accreted land has become "fastland," and it always has had title to the shore and beach between ordinary high tide (mean high tide) and extreme low tide. But, by the fixed-boundary rule, which Washington and "at least two other states" have invented, the upland owner loses the "fastland," which has been added to his upland by slow and imperceptible accretion, and his contact with the line of mean high tide which, in many instances, may have been the reason for the acquisition of the property.

It is apparent also that the purpose of the state is not primarily to make a greater area available for public use, but to dispose of such accreted lands to private individuals and put a new upland owner between the grantees of the original upland owner and the line of mean high tide. That the state does not consider accretion as shore or beach, is evidenced by its sale thereof, for the state certainly would not disregard the statutory declaration that

> [S]hore and beach of the Pacific Ocean, . . . between ordinary high tide [mean high tide] and extreme low tide . . . shall remain forever open to the use of the public. RCW 79.16.170

and that no part thereof "shall ever be sold, conveyed, leased or otherwise disposed of." (RCW 79.16.171)

3. The really pertinent decision in Washington is not the *Eisenbach* case, which has nothing to do with imperceptible accretions, but the case of *Ghione v. State*, 26 Wn.2d 635, 175 P.2d 955 (1946). The state asserted there, as it does here, that it was entitled to all lands covered by navigable waters in 1889. The state also contended that it was entitled to all lands submerged by navigable waters subsequent to 1889.

The court discussed a number of cases—including *Eisenbach* and an 1899 statute on accretions (cited here by the majority)—before adopting a shifting boundary theory which vested title to imperceptible accretions in the upland owner. The majority seeks to distinguish the *Ghione* case because it involved a river, but the court there believed that the shifting boundary theory applied "to both tidewaters

and fresh waters," and there is no apparent reason for distinguishing between them.

4. No consideration has been given to the effect of the fixed boundary theory where there has been an erosion instead of an accretion. We can only speculate as to how the majority opinion would read if this were an erosion case. At certain places, the 1889 line of ordinary high tide or mean high tide is now a long way out in the Pacific Ocean, in consequence of erosion, and the upland owner has seen his upland become tideland to which he has heretofore thought he had no title. Under the majority rule, the upland owner would continue to have title to the 1889 line, and the public, seemingly, would have to swim to enjoy its "highway" and beach rights. Only under the shifting boundary rule will the rights of the public always be preserved in the property in the beds and shores of all navigable waters in the state, up to and including the line of ordinary high tide—"in waters where the tide ebbs and flows."

I would follow the federal cases, adhere to the shifting boundary rule, and affirm the trial court.

HUNTER, J., concurs with HILL, J.

---

April 14, 1966. Petition for rehearing denied.