[No. 25460. *En Banc.* August 15, 1935.]

ELMER SCOTT, *Respondent,* THE STATE OF WASHINGTON
*et al., Interveners-respondents,* v. STANDARD OIL
COMPANY OF CALIFORNIA *et al., Appellants.*[1]

[1]Reported in 48 P. (2d) 593.

**124**

GERAGHTY, J., dissents.

*Battle, Hulbert, Helsell & Bettens,* for appellant Standard Oil Company of California.

*John S. Robinson* and *Glenn J. Fairbrook,* for appellants Port of Seattle *et al.*

*Adam Beeler, Howard A. Hanson, The Attorney General,* and *George Downer, Assistant,* for respondents.

TOLMAN, J.—The appellant Standard Oil Company of California, hereafter referred to as "the company," is the owner of lots 1 to 9 in block 371 of Seattle Tide Lands, as platted. This tract is bounded on the north by Railroad avenue and on the west by East Waterway. It is used, and has been extensively improved by the company, for the purpose of storing, handling and disposing of petroleum products which are brought to its plant from California in ocean-going steamers. The company has constructed out from its property and diagonally north into East Waterway, a dock, the greater part of which is within the prolongation of

the lines of Railroad avenue from the east margin of the waterway to the pierhead line established by the Federal government, one hundred and twenty-five feet out from the margin. For many years prior to 1927, this dock was maintained under annual permits from the port of Seattle, hereafter referred to as "the port."

On October 18, 1927, an agreement was entered into between the port and the company, by the terms of which the port granted to the company, for the period of twenty years, the use of this waterway, and as a consideration for which the company agreed to pay the port the sum of fourteen hundred dollars per annum. The instrument contained the following reservations:

"This permit is made upon the following conditions and provisions:

" (1) Party of the first part reserves the right to cancel said lease by giving six months notice in writing in case the demised premises are needed by the party of the first part, the City of Seattle, the United States Government or any municipal sub-division of the City of Seattle, for the purpose of erecting a major improvement thereon.

" (2) Party of the second part shall have the right to cancel said lease by giving six months notice in writing in case party of second part discontinues the operation of its present plant located on a portion of Block No. 371, Seattle Tide Lands, or if party of second part secures the use of other waterfront facilities enabling it to discontinue the use of said premises.

" (3) The party of the second part shall not assign or sublet the said area or any portion thereof without first obtaining the written consent of the party of the first part thereto.

" (4) The second party covenants not to make or suffer to be made any artificial filling in any of such area, or any deposits of rock, earth, ballast, garbage or other material within such area, except such as

may have been previously approved in writing by the party of the first part.

"(5) In case the party of the second part shall propose to improve said area with any structure or structures other than those now situated thereon, and/or to dredge said area, the party of the second part shall first submit the plans of the proposed improvements and/or dredging to the party of the first part and only shall proceed with such new structures and/or dredging upon obtaining the written consent and approval of the plans by the party of the first part."

In October, 1932, the company submitted to the port a plan for the reconstruction of its dock in the described area. This plan was approved by the port, and permission for its construction granted. Thereafter, this suit was instituted by the respondent Scott to enjoin the company from further maintaining its dock in the waterway area within the extended lines of Railroad avenue. An injunction was also sought to restrain the port from granting to the company, or any other person, any private rights in this area. The state of Washington and its commissioner of public lands intervened in the action, seeking substantially the same relief. After trial to the court, a decree was entered for the plaintiff and interveners, and this appeal followed.

The issues raised by the appeal involve the use and control of the waterway area in controversy. The appellants contend that the control and use are vested in the port of Seattle; the respondents contend that the control is in the city of Seattle by reason of the dedication of Railroad avenue across the waterway. The interveners, state of Washington and Martin as commissioner of public lands, unite with the respondent Scott in the contention that Railroad avenue was dedicated across the waterway, and assert an interest in

the controversy, since the state holds the paramount title to the waterway.

In 1890, the legislature passed an act providing for the establishment of one or more waterways across tide lands within or in front of incorporated cities and towns and within two miles either way from any such city or town. Laws of 1889-90, p. 731. The board of harbor line commissioners was authorized and instructed to carry out the provisions of the act and to begin operations as soon as practicable after its passage and approval. The waterways to be constructed are referred to in the act as public ways for water crafts across tide flats. Section 5 of the act provides that:

"All the public ways that may be established under the provisions of this act are, and shall forever be, reserved from sale or lease as public ways for water crafts."

Proceeding under the provisions of this act, the board of harbor commissioners prepared a plat of East and West Waterways and filed the plat in the office of the commissioner of public lands on July 12, 1894. East Waterway, as shown upon this plat and later constructed, is one thousand feet wide. Later, the Federal government established pierhead lines in the waterway two hundred and fifty feet out from its margins, reserving for unobstructed navigation a fairway five hundred feet wide. Subsequently, the pierhead lines were established at a distance of one hundred and twenty-five feet from the margins, increasing the width of the fairway to seven hundred and fifty feet.

The state's title to the water and the land underneath was not affected by the establishment of the pierhead lines by the Federal government. The lines established the limits to which free navigation of the

channel could be obstructed by structures such as wharves, piers and docks. The lines had no other effect than the publication of the action taken by the Federal government. *Port of Seattle v. Oregon & Washington R. Co.*, 255 U. S. 56, 41 S. Ct. 237.

Prior to 1913, there was no legislation by the state respecting the use of the area between the pierhead lines and the outer margins of the waterway. The 1913 session of the legislature enacted chapter 168, p. 582, entitled:

"AN ACT permitting and regulating the use of waterway areas between the boundaries thereof and government pierhead lines, and providing for the disposition of receipts therefrom."

The act provided that whenever, in any waterway created under the laws of the state, the government of the United States shall have established pierhead lines, no structures are to be allowed in the area between the boundaries and the nearest pierhead line, except by the consent of the state land commissioner and upon plans approved and terms and conditions fixed by him, and then only for such period of use designated by him, not extending for more than thirty years. The act granted to owners of land abutting on the waterway the right, if application be made therefor within ninety days following the effective date of the act, to secure a permit for a term of thirty years, subject to certain conditions with respect to improvement of the area. Provision was made for payment of rental to the state by the holders of permits, for the giving of a bond to secure payment of the rental, and for the cancellation of permits for failure to give bond or for a substantial breach by the holder of the permit of any of its conditions. The act provided:

"In any case where such waterway shall be within the territorial limits of a port district organized under

the laws of the State of Washington, the duties herein assigned to the state land commissioner shall be exercised by the port commission of such port district, and in every case the rentals received shall be disposed of as follows: Seventy-five (75) per cent. shall be paid by the state treasurer to the county treasurer of the county wherein such port district is situated, for the use of said port district and twenty-five (25) per cent. into the state treasury, except that in cases where the port district itself shall have constructed or shall own structures or improvements situate upon such strip of waterway the entire rentals for such improved strip of waterway shall be paid directly to such county treasurer for the use of such port district. Nothing herein contained shall confer upon, create or recognize in any abutting owner any right or privilege in or to any strip of waterway abutting any street and between prolongations of the lines of such street, but the control of and the right to use such strip is hereby reserved to the state of Washington, except that in cases situate in a port district such control and use shall vest in such port district." (Rem. Rev. Stat., § 8017.)

It will be seen that, by the last quoted provision, the use and control of the waterway area in controversy here is vested in the port district unless, as contended by respondents, it is embraced within the limits of Railroad avenue and under the control of the city of Seattle. It is to be noted that the city of Seattle itself is not a party to this suit and is asserting no claim here. It may also be noted that the company is asserting no right as an abutter in the waterway area in controversy.

This brings us to a consideration of the question whether Railroad avenue is dedicated across East Waterway. Under Art. XVII of the constitution, title to tide lands passed to the state, upon its creation, in full proprietary ownership. *Port of Seattle v. Oregon & Washington R. Co.*, 255 U. S. 56, 41 S. Ct. 237;

*Eisenbach v. Hatfield,* 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632; *Grays Harbor Boom Co. v. Lownsdale,* 54 Wash. 83, 102 Pac. 1041, 104 Pac. 267; *Newell v. Loeb,* 77 Wash. 182, 137 Pac. 811; *Hill v. Newell,* 86 Wash. 227, 149 Pac. 951.

The state, possessing the title, could dispose of the tide lands at will. By an act passed March 26, 1890 (Laws of 1889-1890, p. 431), the legislature provided for the appraisal and disposition of its tide lands. It provided for the appointment by the governor of a local board of appraisers in each county of the state where shore and tide lands existed. These boards were to examine, survey and appraise the shore and tide lands in their respective counties lying within or in front of incorporated cities and towns. They were to prepare plats, in duplicate, of the tide and shore lands and file one copy of the plat with the county auditor and the other with the state board of equalization provided for in the act.

 Proceeding under authority of this act, a board of appraisers was appointed for King county, and plats of the tide lands were made, including the lands here involved. The law made no express provision for the dedication of streets and public ways upon the plats prepared by the appraisers, nor was there any specific reference in the act to the platting of streets. Doubtless, it was assumed that the platting of the tide lands into lots and blocks necessarily involved dedication of street areas. This omission, if such it was, in the act of 1890 was supplied by chapter CLXXVIII, Laws of 1895, p. 527. Section 54 of this act provides

" . . . that all alleys, streets, avenues, boulevards and other public thoroughfares heretofore located and platted on tide lands of the first class by boards of tide land appraisers, are hereby validated as public highways and dedicated to the use of the public for the purposes for which they were intended; and

no improver, upland owner or other person shall have the right to buy the whole or any part of any such alley, street, avenue, boulevard or other thoroughfare." [Rem. Rev. Stat., § 7964.]

Section 64 of the act provided that all surveys, appraisements, maps and plats theretofore made and filed with the state board of land commissioners or the commissioner of public lands by the local boards of tide land appraisers "are hereby expressly confirmed, subject only to review as in this act provided."

The plat filed by the board of appraisers clearly indicates that the continuity of Railroad avenue is broken at the margin of East Waterway. The street again appears on the plat beginning at the west margin of the waterway and extends across what is known as Harbor Island to the east margin of West Waterway, and is shown again on the plat from the west margin of that waterway westward. No extension of the lines of Railroad avenue across the waterways is shown on the plats; on the contrary, the boundaries of the two waterways are delimited by heavy lines, in which terminate the lines bounding Railroad avenue.

It is to be remembered that East and West Waterways were surveyed and platted prior to the platting of the tide lands, and that the tide land plats were controlled by, and conformed to, the waterway plats.

The respondents called engineers as expert witnesses, who attempted to interpret the plat as indicating a purpose to continue Railroad avenue across both waterways. Other experts testified to the contrary. In our opinion, the plat is free of ambiguity and requires no extrinsic evidence for its interpretation. The formal paper dedication of Railroad avenue across the waterways would have been an idle gesture. It is not to be assumed, in the absence of acts showing an intention to do so, that, after incurring the expense of con-

structing two waterways, each one thousand feet in width, for the accommodation of water crafts, the state would unconditionally dedicate to the city a street across them. Our laws contemplate that streets may be carried across navigable waters, but only by bridges built in accordance with approved plans and in a manner not to obstruct navigation, and after permission from the Federal government. Rem. Rev. Stat., §§ 7797-93, 9329 and 9330 [P. C. §§ 6334-103, 889 and 890].

Reference is made in respondents' brief to the platting of Railroad avenue over the tide lands south of Elliott Bay prior to the admission of the state into the Union, but the city could have acquired no right by such plats as against the state. *Henry v. Seattle,* 42 Wash. 420, 85 Pac. 24.

We are of the opinion that Railroad avenue is not dedicated across East Waterway, and that the control and use of the waterway area abutting Railroad avenue and within the pierhead lines are vested in the port.

We are next to consider the extent and character of the port's power and its right to make the agreement of October 18, 1927, with the company. Are the use and control granted governmental in character and limited to the port's own public operations as an agency of the state, or do they authorize the granting of permits to private persons to the extent authorized by the act of 1913 with respect to the waterfront area abutting private property and lying between the margins of the waterway and the pierhead lines? This is the vital question in the case, as we see it, and the answer is to be determined from the known and admitted facts and from the meaning and intention of the legislature as expressed in chapter 168, Laws of 1913, p. 582 [Rem. Rev. Stat., § 8017].

The facts are that the state held full fee simple title in a proprietary capacity and could grant to the port district any part or all of the title which it possessed, or could grant anything less than title in the way of the right to possession and use which the legislature might deem advisable. What was granted to the port district by the act in question?

"Nothing herein contained shall confer upon, create or recognize in any abutting owner any right or privilege in or to any strip of waterway abutting any street and between prolongations of the lines of such street, but the control of and the right to use such strip is hereby reserved to the State of Washington, except that in cases situate in a port district such control and use shall vest in such port district." (Rem. Rev. Stat., § 8017.)

In our judgment, this final provision evidences very clearly three purposes: (1) A clear denial of any right in abutting owners to the use or enjoyment of the area in front of any street end; (2) a reservation of all such areas to the state as owner; and (3) a grant of all of the use and control which, as owner, the state might enjoy, to the port district. The language used will permit of no other construction. When the owner reserved the right to use and control and in the same sentence says that "such control and use shall vest in such port district," it cannot be doubted that all that the state had of use and control was thus immediately granted and passed on to the port district.

We have examined with care all of the enactments since 1913 to which we have been referred, and bearing in mind the rule that repeals by implication are not favored by the law, we cannot find anything warranting a holding that chapter 168, Laws of 1913, p. 582, has been repealed by implication, or that it has in any wise been altered or amended.

Other questions are raised by the respondents, going to supposed technical defects in the permit or in the manner of its issuance and the like, upon some of which the trial court seems to have placed some reliance, but when carefully considered, the answer to each seems so obvious that we deem it unnecessary to extend this opinion by stating and discussing such questions. After careful consideration of each of them, we find nothing in any which can sustain the judgment.

We conclude that the judgment appealed from must be reversed and the action dismissed. It is so ordered.

MITCHELL, STEINERT, MAIN, HOLCOMB, BEALS, and BLAKE, JJ., concur.

GERAGHTY, J. (dissenting)—I fully agree with the conclusion reached by the majority upon the issues of fact in this case, and concur in the legal conclusion that the control and use of the street-end area abutting Railroad avenue within the pierhead lines are vested in the port of Seattle, but I differ from the view of the majority as to the extent and nature of the port's control.

Chapter 168, Laws of 1913, p. 582, provides that no structure shall be allowed in the strip of waterway between the boundary and the nearest pierhead line, except by the consent of the state land commissioner, and upon plans approved and terms and conditions fixed by him. It is then provided that, in any case where the waterway shall be within the territorial limits of a port district, the duties assigned to the state land commissioner are to be exercised by the port commission. The act closes with this provision:

"Nothing herein contained shall confer upon, create or recognize in any abutting owner any right or privilege in or to any strip of waterway abutting any street and between prolongations of the lines of such street, but the control of and the right to use such strip is

hereby reserved to the State of Washington, except that in cases situate in a port district such control and use shall vest in such port district.'' (Rem. Rev. Stat., § 8017.)

As I read it, this final provision evidences a purpose to classify this area apart from the rest of the marginal strip fronting on private property. The state reserves to itself the control and use of street-end areas outside port districts and vests in the port district the control and use of the street ends within their boundaries. No power is given the commissioner of public lands to grant permits for private use within the street-end areas outside port districts. I think it equally clear that no greater authority was given to the port with respect to street-end areas within the district; that the use and control vested in the port was a trust for its own purposes in the performance of its public duties. Being so, its use is subject to the limitations contained in § 5 of the act of 1890 (Laws of 1889-90, p. 731). The limitations of this section, while modified by the 1913 act as to the portion of the marginal area outside of the prolongation of street lines, are still controlling as to the street-end area.

This conclusion, reached from a consideration of the act of 1913, finds support in the general policy of our legislation since the admission of the state into the Union. Throughout, there is evidenced a purpose to preserve to the cities access through their streets to the navigable waters of the state, whether natural harbors or artificial ways like the one here involved. This waterway, for its full width, was reserved and dedicated to public use, and being so dedicated, no private structure could be erected therein without the consent of the state. The state gave its consent to the erection of private structures, under certain conditions, in a part of the waterway, but did not give the right in the

part abutting street ends. We are not justified in assuming that the law authorized the erection of private structures in the street-end areas, in the absence of clear and certain language to that effect. Such a right cannot rest in implication, and any uncertainty in the law must be resolved against the claim of private right and in favor of the public use.

I think the judgment of the trial court should be affirmed.

