[No. 42087.    En Banc.    January 11, 1973.]

CLAYTON H. HARRIS, *Respondent*, v. HYLEBOS INDUSTRIES, INC., *Appellant.*

*Bonneville, Hughes & Viert* and *Owen P. Hughes,* for appellant.

*Witt, Hutchins, Plumb & Wheeler* and *Edwin J. Wheeler,* for respondent.

*Slade Gorton, Attorney General, Charles B. Roe, Jr., Senior Assistant, Robert V. Jensen* and *Theodore O. Torve, Assistants,* and *Robert W. Graham (Bogle, Gates, Dobrin, Wakefield & Long, Ronald T. Schaps,* and *Thomas C. O'Hare,* of counsel), amici curiae.

ROSELLINI, J.—The appellant is the owner of a parcel of

platted first class tidelands[1] purchased by his predecessors in title from the State of Washington. The property, which embraces approximately 12 acres, is located in an area of the city of Tacoma which is zoned for heavy industry and abuts on the west on Hylebos Waterway,[2] which has been dredged through a slough formed by Hylebos Creek. As a consequence of this dredging, Hylebos Waterway is used for navigation by ocean-going vessels.

In the past, the appellant has used his property mainly for the storage and movement of logs. At one corner is an artificial island occupied by a small office building. The appellant has announced his intention of filling and improving the entire property.

This action was brought by the owner of uplands lying to the east of the appellant's property. These uplands were patented by the United States in 1886. Coski-Pacific Forge and Tool Co., whose property adjoins that of the plaintiff and was purchased from him, intervened. Both of these parties, respondents here, claimed that they were entitled to cross the property of the appellant at high tide to reach the waterway.

---

[1]Tidelands of the first class are defined in RCW 79.01.020 as follows: "Whenever used in this chapter the term 'first class tidelands' shall mean the beds and shores of navigable tidal waters belonging to the state, lying within or in front of the corporate limits of any city, or within one mile thereof upon either side and between the line of ordinary high tide and the inner harbor line, and within two miles of the corporate limits on either side and between the line of ordinary high tide and the line of extreme low tide." *See* Laws of 1889-90, p. 431, relating to the survey and appraisement of first class tidelands; *also*, Laws of 1901, ch. 161, § 1, p. 326, and RCW 79.01.456. The area in question was replatted under the latter statutes, which required a dedication of all new streets, alleys, public places and waterways, and vacated those that were not replatted. The area shoreward of the meander line was not platted as a part of the tidelands.

[2]The Hylebos Waterway is an artificial waterway first dredged by Commercial Waterway District No. 1 of Pierce County around 1915. It was dredged through the tidelands owned by the appellant's predecessor and through adjoining uplands. The formation of commercial waterway districts was authorized by Laws of 1911, ch. 11 (RCW 91.04), repealed in 1971.

Neither of the respondents claimed an easement by grant or prescription, nor did they seek to condemn a way of necessity.[3] No reliance was placed upon any statute giving them a right to cross their neighbor's tidelands. It was not claimed that the plat of the tidelands shows a street crossing the appellant's property and leading to the waterway.

There was no assertion that the tidelands are in a recreation area or are accessible to or used by the public.

It was the theory of the respondents that they are the owners not only of uplands but also of tidelands, and that, as such, they have a right of access to any navigable channel which may flow nearby. The asserted ownership of tidelands has the following derivation: When the respondents' lands were patented, no boundary was described between the land and the waters of Commencement Bay, but reference was made to the meander line shown on the government survey to determine the amount of land patented. The meander line was seaward of the line of ordinary high tide. We have held that, where this situation occurred, Const. art. 17, § 2, wherein the state disclaimed all title to tidelands patented by the United States, operated to vest title in the patentee to that portion of tideland lying between the meander line and the line of ordinary high tide. *Narrows Realty Co. v. State*, 52 Wn.2d 843, 329 P.2d 836 (1958). In other words, we have held that the boundary of such patented land is stationary at the meander line, if that line is lower than the line of ordinary high tide.[4]

The result of this doctrine is that, where the government meander line lies to the seaward of the line of ordinary high tide, the upland patented to the grantee will in fact include some land which is washed by the tides. The re-

[3]*See* RCW 8.24.010 *et seq.* The respondents' properties are not landlocked; they abut on a city street.

[4]*Cf. Hughes v. Washington*, 389 U.S. 290, 19 L. Ed. 2d 530, 88 S. Ct. 438 (1967), *rev'g Hughes v. State*, 67 Wn.2d 799, 410 P.2d 20 (1966), holding that the extent of ownership of patented land is governed by federal law and that the boundary of land bordering on a body of navigable water changes with accretion and erosion.

spondents claimed that, since some of their land is submerged at high tide, they are "owners of tidelands" and that, as such, they are entitled to cross tidelands owned by others to reach public waterways.

The appellant accepted the meander line as the boundary between his property and that of the respondents. His position was that, as holder of an unrestricted title derived from the State of Washington, he is entitled to fill and improve his property, and that this property is subject to no easement in favor of adjoining owners of either tidelands or uplands.

The matter was tried to the court, which decided that the respondents were entitled to an easement 40 feet in width, extending across the appellant's tidelands to the waterway, to be used by them when the land was inundated with tidewater. The appellant was enjoined from filling or obstructing this area.

In reaching its decision, the trial court recognized that the law is settled in this jurisdiction that the owner of uplands, whether derived through federal patent or from the state, has, as such, no riparian rights in navigable waters. Early cases which established this rule are cited in *Port of Seattle v. Oregon & Wash. R.R.*, 255 U.S. 56, 65 L. Ed. 500, 41 S. Ct. 237 (1920). The railroad in that case, which had purchased from the state uplands and tidelands abutting on a waterway, claimed the right to build piers and wharves over it to reach the navigable channel in the center.

The Supreme Court, having stated that the law of the state determined whether riparian rights exist in navigable waters, said:

> Under the law of Washington (which differs in this respect from the law generally prevailing elsewhere) a conveyance by the State of uplands abutting upon a natural navigable waterway grants no right of any kind either in land below highwater mark, *Eisenbach* v. *Hatfield*, 2 Washington, 236 [26 P. 539 (1891)]; or in, to, or over the water, *Van Siclen* v. *Muir*, 46 Washington, 38, 41

[89 P. 188 (1907)]; except the limited preferential right conferred by statute upon the owner of the upland, to purchase the shoreland, if the State concludes to sell the same. Act of March 26, 1890, §§ 11 and 12, Laws of Washington 1889-1890, p. 505. The grantee of the upland cannot complain of another who erects a structure below highwater mark, *Muir* v. *Johnson,* 49 Washington, 66 [94 P. 899 (1908)]. He does not acquire any right of access over the intervening land and water area to the navigable channel, *Lownsdale* v. *Grays Harbor Boom Co.,* 54 Washington, 542, 550, 551 [103 P. 833 (1909)]. So complete is the absence of riparian or littoral rights that the State may—subject to the superior rights of the United States—wholly divert a navigable stream, sell the river bed and yet have impaired in so doing no right of the upland owners whose land is thereby separated from all contact with the water. *Newell* v. *Loeb,* 77 Washington, 182, 193-194 [137 P. 811 (1913)]; *Hill* v. *Newell,* 86 Washington, 227, 228 [149 P. 951 (1915)].

255 U.S. at 64.

*Eisenbach v. Hatfield,* 2 Wash. 236, 26 P. 539 (1891), cited in *Port of Seattle v. Oregon & Wash. R.R., supra,* involved first class tidelands within 1 mile of the corporate city limits of Tacoma. The plaintiff owned uplands bordering on Puget Sound. He objected to the defendant's placing on his adjoining tidelands certain improvements which were in actual use for commerce, trade and business. After reviewing many authorities on the subject, this court stated:

The foregoing decisions of the highest judicial tribunal of the United States, without other or further authority, would seem to settle, beyond controversy, the question of title to the tide lands of this state, and to leave no doubt whatever that they belong to the state in actual propriety, and that the state has full power to dispose of the same, subject to no restrictions save those imposed upon the legislature by the constitution of the state and the constitution of the United States; and, if this be true, it necessarily follows that no individual can have any legal right whatever to claim any easement in, or to impose any servitude upon, the tide waters within the limits of the state, without the consent of the legislature.

2 Wash. at 244-45. This court said further that

the right of the state to grant the navigable waters, except as restrained by constitutional checks, is as absolute as its rights to grant the dry land which it owns, . . .

2 Wash. at 252.[5]

In the case of *State v. Sturtevant,* 76 Wash. 158, 171, 135 P. 1035 (1913), it was said:

Those who sat in the constitutional convention, and those who met in our early legislative assemblies, were confronted with an important problem when treating the subject of tide and shore lands. Many insisted that the state should reserve title and that the land should never be sold. Others maintained that the best interests of the state demanded that they pass into private ownership, thus becoming a subject of taxation and revenue to the state. The latter theory prevailed, subject to the qualification that the harbor area should never be disposed of. The state has invited investment in these lands upon the theory that, in private ownership, all land lying back of the inner harbor line or the line of ordinary navigability would be reclaimed and put to useful purposes.

In *Puget Mill Co. v. State,* 93 Wash. 128, 134, 160 P. 310 (1916), we said:

It is true that, by the limitations prescribed by article 15 of our constitution, the state authorities are prohibited from disposing of and vesting in absolute private ownership the lands of the state lying under navigable waters *which shall be established as harbor areas;* but it is also true that the same article of our constitution provides that the location of such harbor areas along the shores of navigable waters shall be determined and established by a commission appointed for that purpose, thus rendering certain the line dividing shore lands which may be disposed of and vested in absolute private ownership from the lands within harbor areas which cannot be lawfully so disposed of. *Now it is no longer an open question in this state as to the nature of the title vested in the grantees of second-class tide and shore lands by deeds from the state absolute in form* as these deeds are, upon

---

[5]The legislature has recognized that the reservation of an easement in tidelands, in favor of the public, when such tidelands are sold by the state, requires an express provision in the deed. *See* RCW 47.12.020.

which are rested the titles of the plaintiffs. *The decisions of this court lead to no other conclusion than that the state authorities have the power to, and when conveying lands of this nature by deeds absolute in form do, vest in the grantees an absolute fee simple title to such lands.*

(Italics ours.)

That under the law in this state the riparian owner's natural access to water may be blocked by the owner of the tidelands was again acknowledged by the United States Supreme Court in *Hughes v. Washington,* 389 U.S. 290, 19 L. Ed. 2d 530, 88 S. Ct. 438 (1967), *rev'g Hughes v. State,* 67 Wn.2d 799, 410 P.2d 20 (1966), citing *Port of Seattle v. Oregon & Wash. R.R., supra,* in a footnote.

The latter case has been cited with approval by this court in *Scott v. Standard Oil Co.,* 183 Wash. 123, 48 P.2d 593 (1935); *Commercial Waterway Dist. 1 v. Larson,* 26 Wn.2d 219, 173 P.2d 531 (1946); and *Ghione v. State,* 26 Wn.2d 635, 175 P.2d 955 (1946).

The trial court recognized that the claim of the respondents would be precluded if they based it solely upon their status as upland owners, but it found that they were also the owners of tidelands and concluded that, as such, they were entitled to traverse the tidelands of their neighbor. Assuming, without deciding, that the respondents are owners of tidelands, although the patent under which they claim purported to convey only uplands, we find in our cases no support for the view that, as such, they have easement rights in neighboring tidelands. If such were the law, no owner of tidelands could safely improve them, for he would always be faced with a threat of claimed easements on the part of adjoining owners.

The notion that all tidelands must be left in their natural state is incompatible with the legislative intent on this matter, as it has been expressed in statutes since the inauguration of statehood.

From its first session, the Washington State Legislature passed numerous laws for the purpose of encouraging the development of certain tidelands by lessees and purchasers

thereof. On page 730 of the Laws of 1889-90, provisions were made for the establishment of dikes and dams to prevent overflow from tidewater or river freshets. On the following page the legislature enacted a law dealing with the establishment and defining of public ways for water craft across the tideflats within, in front of and for a mile on either side for incorporated cities and towns in the state of Washington (first class tidelands).

On March 26, 1890, the first legislature passed a tideland act, which gave a preference right of purchase to owners of adjoining uplands, but provided further

[t]hat if valuable improvements in actual use for commerce, trade or business have been made upon said tidelands by any person, association or corporation, the owner or owners of such improvements shall have the exclusive right to purchase the land so improved for the period aforesaid: . . . *Provided,* That nothing in this act shall be so construed to apply to any improvements made after the passage of this act.

Laws of 1889-90, § 11, p. 435.

Obviously, this provision was enacted for the purpose of encouraging the development of first class tidelands and lands adjacent thereto.

The deed of the tidelands involved in this case, from the State of Washington to James M. Ashton, being absolute in form, contains this statement:

Subject, however, to any lien or liens that may arise or be created in consequence of or pursuant to the provisions of an act of the Legislature of the State of Washington entitled "An Act Prescribing the Ways in Which Waterways for the Uses of Navigation May be Excavated by Private Contract, Providing for Liens upon Tide and Shore Lands Belonging to the State, Granting Rights of Way Across Lands Belonging to the State," approved March 9, 1893.

The act referred to in the deed not only provided for the excavation of waterways through lands belonging to the State of Washington or to any citizen or corporation, but also provided for the filling in and raising above high tide

of any tide or shorelands belonging to the State of Washington. The contractor was given a lien on the filled lands, and the act shows a legislative intent that the private purchaser of these tidelands should pay for the fill.

As early as 1895, the legislature provided for the platting of tidelands with streets and alleys dedicated to public use, "with due regard to the convenience of commerce and navigation." Laws of 1895, ch. 178, § 54, p. 550. *See also* Laws of 1897, ch. 89, § 41, p. 248; RCW 79.01.428.

Laws of 1895, ch. 178, §§ 54 and 62, and Laws of 1895, ch. 178, § 45, expressly refer to improvements on tidelands "for commerce, trade, residence or business."

Many other statutes have been enacted which were apparently designed to encourage the development of the particular tide and shorelands affected, including first class tidelands. *See* for example, RCW 53.04; 53.08; 53.20; and 53.32.

Thus, it is apparent that the legislature has regarded the filling and improving of first class tidelands, particularly in commercial harbors, as an aid to navigation, rather than an obstruction. Common observation should reveal that unless deep water can be reached conveniently for the loading of vessels, commerce by water is seriously hampered. The legislature has determined that the best way to facilitate access to deep water is to fill and to authorize the filling of tidelands, and to lay out streets running to and beside wharves and docks, to be used by the public generally, so that vehicles which transport goods by land can reach the ships which will carry them by sea. This is the clear import of the statutory scheme.

The theory that an owner of tidelands, not abutting on a waterway or other channel which is commercially navigable, has a right of access to such waterway or channel, was advanced in the previously cited case of *Port of Seattle v. Oregon & Wash. R.R.*, 255 U.S. 56, 65, 65 L. Ed. 500, 41 S. Ct. 237 (1920). The United States Supreme Court, having noted the Washington rule which was enunciated in

*Lownsdale v. Grays Harbor Boom Co.,* 54 Wash. 542, 103 P.
833 (1909), that a purchaser of uplands does not acquire
any right of access over the intervening land and water
area to a navigable channel, said:

> The Railroad admits that such are the rights of a gran-
> tee from the State, where it is the upland which is con-
> veyed. But it contends that a different rule applies where
> the sale is of tide lands. No basis for the distinction can
> be found either in the decisions of the highest court of
> the State or in reason. Since the upland owner has been
> denied riparian rights in deference to the asserted right
> of the State to control unhampered the course and devel-
> opment of navigable waters, the State's right must be
> superior also to the claim of the tide land owner. For the
> assertion of title in the State was obviously made in
> order that it might not be hampered in developing water-
> ways and harbors in the manner and to the extent that
> the public interest should from time to time demand.
> Such development obviously includes harbor facilities,
> like piers, docks and wharves, as well as adequate chan-
> nels. Compare *State* v. *Bridges,* 87 Washington, 260. The
> proprietary right of the State over navigable waters and
> of the soil thereunder is neither exhausted nor impaired
> by making a sale of a tract of tide land, be it the parcel
> nearest the upland or some other. The State may in one
> year fill and sell the hundred feet of tide lands nearest
> the upland and in the next year fill and sell the parcel
> beyond. Compare *State* v. *Scott,* 89 Washington, 63, 70,
> 72. Or it may sell first the parcel more remote from the
> upland and later the one immediately adjoining it, or any
> other. In every case it may, in conveying the tide land,
> either grant or withhold rights in the water or in the
> water area, as it sees fit.

The Supreme Court concluded in that case:

> It appears, therefore, that the law of Washington does
> not recognize as appurtenant to upland, tide land or
> shore land in its natural condition, rights of any sort
> beyond the boundaries of the property. A right of access
> to the navigable channel over intervening land, above or
> below low water, must arise from a grant by the owner
> of the intervening property.

255 U.S. at 67.

780

The law would seem to be clear then, in this jurisdiction, that, in the absence of an express grant, an owner of land, whether upland or tideland, as such, does not have a right to an easement across tidelands owned either by the state or by a private individual, to reach a navigable waterway or channel.[6]

The respondents contend, however, that this court has recognized the existence of such a right. They cite the cases of *Dawson v. McMillan*, 34 Wash. 269, 75 P. 807 (1904); *Spath v. Larsen*, 20 Wn.2d 500, 148 P.2d 834 (1944); *Commercial Waterway Dist. 1 v. Permanente Cement Co.*, 61 Wn.2d 509, 379 P.2d 178 (1963); and *Wilbour v. Gallagher*, 77 Wn.2d 306, 462 P.2d 232 (1969).

*Dawson v. McMillan*, *supra*, was a suit to restrain an owner of second class tidelands[7] from obstructing the channel of a slough which was found by the trial court to be navigable. Since the channel was found to be a "navigable highway," used by the public generally for transportation and floating logs, this court held that the owner of the second class tidelands through which it flowed could be enjoined from obstructing it.

While the respondents maintain that the plaintiff in that case was an owner of tidelands, that fact does not appear in the opinion. Furthermore, the plaintiff was not in fact given the right to cross the tidelands of the defendant to reach the navigable channel, but only to traverse the channel itself. The channel in that case is analogous to the Hylebos Waterway in this. The respondents here have the right to use the waterway and the appellant has no right to obstruct it. The case does not support the respondents' con-

[6]The cases as they stood in 1948 are discussed in J. Obenour, *Water Boundaries, Tide and Shore Land Rights*, 23 Wash. L. Rev. 236 (1948).

[7]Second class tidelands are defined in RCW 79.01.024 as follows: "Whenever used in this chapter the term 'second class tidelands' shall mean public lands belonging to the state over which the tide ebbs and flows outside of and more than two miles from the corporate limits of any city, from the line of ordinary high tide to the line of extreme low tide."

tention that they have a right to an easement across the appellant's first class tidelands to reach the waterway.

The second case cited, *Spath v. Larsen, supra,* was a suit to settle the boundaries between tidelands owned by the parties fronting on a bay. This court spoke of the "right" of adjoining owners to "enjoy access to deep waters" at low tide, however; no citation of authority was given for the proposition that such a right exists. In the context of the opinion, the language used meant only that adjoining owners of tidelands fronting on a bay have a right to have their boundaries so drawn that each owns some land which extends to the water's edge at low tide. Neither party in that case was given any right to enter upon the property of the other in order to reach the water.

The third case cited, *Commercial Waterway Dist. 1 v. Permanente Cement Co., supra,* is more troublesome, in that the defendant in that case was given a temporary easement in a public waterway belonging to the plaintiff waterway district. However, significant differences exist between that case and this.

That case was decided by a department of this court and only three judges concurred in the majority opinion. The waterway district which owned the Duwamish Waterway in Seattle brought the action to quiet its title to a portion of the waterway upon which the cement company had erected and maintained certain loading facilities, and to eject the cement company therefrom. The right-of-way for the waterway, which the plaintiff had condemned in 1912, was 500 feet in width, and at one time had been dredged for navigation to its full width; but as time passed, the width of the channel which was kept dredged for use by large vessels was reduced to 250 feet.

The cement company had acquired tidelands abutting upon the waterway in 1946. At that time it obtained permission from the Army Corps of Engineers,[8] to dredge

---

[8] Since 1924 the Corps of Engineers had supervised the dredging of the channel, which was done at federal expense.

parts of the waterway lying between its property and the dredged channel and to erect thereon a permanent dock and loading facilities to accommodate ships of more than 400-foot length. The permit obtained from the Corps of Engineers "by express language did not preclude the necessity of Permanente obtaining state assent to construct its proposed facilities." 61 Wn.2d at 520 n.2. The cement company did not obtain express permission. However, the waterway district had not objected to the dredging and the construction of the dock, and had never exacted any fee for the use of the area or demanded the removal of the improvement, until it brought its ejectment action.

It was the theory of the cement company in that case that it had acquired by adverse possession a right to maintain the dock. All five judges hearing the case concurred in the opinion that title cannot be acquired by adverse possession to property of the state or to property held by a municipality for public purposes. Three judges agreed that the waterway district did not have the authority to lease the land occupied by the dock, because it was situated in the waterway right-of-way, and the right to lease such property would carry with it the right to authorize obstruction of navigation in the waterway. Two of the judges did not accept this reasoning, but felt that there was no right to lease the property because harbor lines had not been established pursuant to Const. art. 15. We are not called upon to comment upon either of these theories, since it is not this portion of the decision upon which the respondents rely.[9]

While it was held that the abutting tideland owner could not acquire an easement in the waterway by adverse possession nor by lease from the owner, the five judges hearing the case nevertheless held that the cement company could not be ejected. At the same time, it was recognized that this court had held in *Eisenbach v. Hatfield*, 2 Wash.

---

[9]We draw attention to RCW 79.16.190, which gives to the land commissioner and to port districts the authority to issue permits to construct wharves, etc., in waterways and provides for the allocation of fees derived therefrom.

236, 26 P. 539 (1891), that abutting upland owners have no riparian rights of access to navigable waters in the state of Washington.

The case was decided upon equitable considerations, the court noting that the cement company had obtained a permit from the United States government to construct the improvements in the waterway, that the waterway commission had acquiesced for many years in the use of these facilities, that they interfered in no way with navigation in the channel, and that they were themselves an aid to navigation and in harmony with the legislative purpose in establishing the waterway. It was said that the obvious intent of the legislature was that owners of property abutting upon the waterway should make use of it, and that this could not be done without the aid of docks or piers to reach the channel, since it was not kept dredged to its full width.

That the legislature recognized that such facilities would be necessary is manifest in RCW 79.16.190. No doubt the judges who decided the case gave weight to the consideration that if harbor lines were drawn, the structures could have been authorized by the waterway commission under the applicable statutes and a fee charged for their use. With all these considerations in mind, it was concluded that the extreme remedy of abatement should not be ordered, as long as the particular structures did not interfere with actual navigation in the waterway.

There is more than one reason why that case does not aid the respondents in their theory that, as owners of adjoining "tidelands," they have a right to an easement across the tidelands of the appellant to reach the public waterway. In the first place, their lands do not abut upon the waterway and therefore we do not have present in this case the factor which most strongly swayed the court in *Commercial Waterway Dist. 1 v. Permanente Cement Co., supra,* namely, that the structures erected by the cement company were appropriate to give effect to the legislative intent that abutting owners should make use of the waterway.

Furthermore, the other equities which favored the cement company are not present here. It was clear in that case that, had the waterway been privately owned, a prescriptive right to maintain the dock would have been established. There is no claim in this case that any acts have been done which would establish such a prescriptive right. Weight was given in that case to the fact that a great financial loss to the defendant, a large and useful industry, would result if it were ejected, and to the fact that denial of this remedy would result in no corresponding loss to the owner of the waterway and no interference with any other use to which the waterway could be put. The respondents have invested no money upon the tidelands of the appellant; and the easement granted by the trial court interferes substantially with the appellant's development and use of its land. Had even the last mentioned factor been present in the *Commercial Waterway* case, ejectment would undoubtedly have been ordered.

In quieting title in the owner of the waterway and at the same time refusing ejectment, this court disposed of that case in an extraordinary manner, which was demanded by its peculiar facts. The rule of that case will not be extended to cases not presenting comparable equities.

The case upon which the trial court placed its chief reliance in granting the easement, is *Wilbour v. Gallagher, supra,* a case which has engendered considerable controversy.[10] That was a suit brought by owners of residences on the shore of Lake Chelan, seeking damages for loss of view and access to the lake allegedly occasioned by the placing of a fill on land belonging to the defendants and the establishment of a trailer court thereon. The action was

---

[10]The controversy is typified by two law review articles, C. Corker, *Thou Shalt Not Fill Public Waters Without Public Permission—Washington's Lake Chelan Decision,* 45 Wash. L. Rev. 65 (1970), and E. Rauscher, *The Lake Chelan Case—Another View,* 45 Wash. L. Rev. 523 (1970). *See also* on a related subject, R. Johnson & G. Morry, *Filling and Building on Small Lakes—Time for Judicial and Legislative Controls,* 45 Wash. L. Rev. 27 (1970).

a class action, brought not only on behalf of the plaintiffs but also on behalf of the public, which, it was asserted, had gained a prescriptive right to use the lake during those portions of the year when, due to the closing of a dam, the water level was raised and the surface of the lake expanded in area.

The defendants in that action owned lands which they had purchased from companies which built the dam. The lands were situated in an area which had previously been platted as a part of the town of Lakeside. When the building of the dam was proposed, it was foreseen that these lands would be inundated during a portion of each year. Consequently, the town had vacated the streets in the platted area but had obtained from the companies a "quitclaim" of the right of access for the public over the boundaries of the vacated streets to the waters of the lake. The lands of the defendants in the Chelan case were derived through deeds which made them subject

> "to the perpetual right to raise the waters of Lake Chelan, Washington to the elevation of eleven Hundred (1100) feet above mean sea level, and to perpetually inundate and overflow [said property] to said elevation of eleven hundred (1100) feet above mean sea level."

77 Wn.2d at 314 n.11.

It was judicially noticed that the lake was navigable and that it was used by the public for recreational purposes. The area of the town involved was a residential area. We held that the public had the right to use the entire surface of the lake and that the defendants had no right to fill their land and obstruct this public use in the absence of some governmental authorization to do so. *See* 77 Wn.2d at 317 n.13.

As the opinion will reveal, none of the cases cited herein pertaining to the legal status of tidelands deeded to private individuals by the state were considered pertinent to the question before the court in that case. The obvious reason is that such tidelands, as we have heretofore pointed out, have never been classified by the state as navigable

waters, but rather have been treated as land. Particularly, where such lands lie in city harbors, as here, they have been regarded as most suitable for reclamation and for dedication to the purposes of commerce and industry.

There are a number of other differences between that case and this. Lake Chelan is in a recreational area; the tidelands involved in this case are in an area dedicated to heavy industry. In that case, there was no evidence that the legislature or other governing body intended that the lands in question be reclaimed. The legislative intent regarding the use of tidelands in harbors of cities is manifestly that the navigable portions of such harbors, behind the harbor lines, shall consist of commercial waterways, and that the filling and reclaiming of the tidelands which have been sold to private parties shall be encouraged.[11]

■ Another important distinction between that case and this is that we were there concerned with the right of the public to use the portion of the lake which had been filled by defendants. Here there is no claim and no showing that the public has any access to the appellant's tidelands. The public uses the waterway which flows to the west of the appellant's property and the street which passes on the east side of the respondent's property. Insofar as we are advised, it has no reason to go upon the appellant's property and does not do so. All that is claimed here is a right to a private easement.

In the case of *Wilbour v. Gallagher*, 77 Wn.2d 306, 462 P.2d 232 (1969), we did not purport to and did not intend

---

[11]The Attorney General, filing a brief on behalf of the Department of Ecology, calls our attention to the fact that the legislature, in enacting the Shoreline Management Act of 1971 (Laws of 1971, ch. 286, p. 1496), has undertaken to regulate the use of such lands, and that the defendant in this case is subject to the provisions of that act, in that he must obtain a permit before undertaking to fill his tidelands. If the Shoreline Management Act contains provisions showing that the legislature has changed its policy regarding the proper use of harbor areas, those provisions have not been brought to our attention.

The Attorney General has also filed a brief on behalf of the Department of Natural Resources, urging that the decision of the court below be reversed.

to overrule, *sub silentio*, all of the case law in this jurisdiction pertaining to tidelands of the first class, or to ignore all the statutory law pertaining thereto. As the footnote at page 317 of the opinion discloses, we had in mind the right of appropriate governing bodies to authorize fills and commercial uses of lands situated on the shores of navigable bodies of water. It also should be clear from the opinion that we did not recognize in the plaintiffs any right to an easement in their neighbor's land, existing solely as an incident to their ownership of adjoining lands, as the respondent would have us do here.

Applying the settled rule in this jurisdiction, we hold that the respondents, relying as they do solely on their status as adjoining upland or tideland owners, have no right to claim an easement across the first class tidelands belonging to the appellant, in order to reach a commercial waterway.

The judgment is reversed and the action is dismissed.

FINLEY, HUNTER, HAMILTON, STAFFORD, and UTTER, JJ., and TUTTLE and MIFFLIN, JJ. Pro Tem., concur.